# CHARLESTON.

## HASKELL AND OTHERS v. SUTTON AND OTHERS.

Submitted February 11, 1903.   Decided April 18, 1903.

1.  OIL LEASE.
    Petroleum oil· and natural gas are included in the comprehensive idea which the law attaches to the word "land," and are a part of the soil in which they are found. A lease of land for the purpose of mining coal, or extracting oil or natural gas from the soil, or rock, is, in effect, a grant of a part of the *corpus* of the land. (p. 214).

2.  GUARDIAN AND WARD—*Oil Lease.*
    Without authority from a court of equity in a proper proceeding, a guardian, in this State, cannot lease the land of his ward for oil, or gas purposes, or for other developments. (p. 215).

3.  WIDOW'S DOWER.
    A widow entitled to dower in land, is not seized of any part of the land, by any right of dower, until it is assigned to her. (p. 215).

4.  VOID LEASE—*Trespass.*
    Where a person enters upon land, without authority, under a void lease, and drills thereon, and takes petroleum oil therefrom, and removes the same from the premises; and threatens to drill other wells, and to take the oil produced therefrom, a court of equity will perpetually enjoin him from all operations under said void lease, will cancel said lease, and retain the cause for all purposes, and proceed to a final determination of all the matters at issue therein; although the plaintiffs may have a remedy at law against the wrong doer, for the trespass. (p. 216).

Appeal from Circuit Court, Hancock County.

Bill by Haskell Bros. against H. S. Sutton and others. Decree for plaintiffs, and defendants appeal.

*Affirmed.*

OLIVER MARSHALL and HENRY M. RUSSELL, for appellants.

D. E. MITCHELL and JOHN R. DONAHOE, for appellees.

MILLER, JUDGE:

James W. Morrow, died intestate on the 25th day of March, 1878, seized and possessed in fee of a tract of land, containing

one hundred and seventy-five acres, situate in Hancock County, West Virginia. He left surviving him, his widow, Emma Morrow, and two sons, Walden Morrow, born in 1870; and George Morrow, born in 1876, his sole heirs at law. On the 27th day of October, 1888, said Emma Morrow was duly appointed guardian of her two minor children, Walden and George Morrow. By the death of their father, said Walden Morrow and George Morrow became the joint equal owners, and possessed in fee, of said tract of land, subject to the dower therein of their mother, Emma Morrow.

On the 2nd day of November, 1888, said Emma Morrow, in her own right, and as guardian of said infant children, by written agreement of that date, without first obtaining authority so to do, under chapter 83 of the Code, leased to John McKeown, for oil and gas purposes, for the term of twenty years, one hundred and thirty-five of said one hundred and seventy-five acres. This lease was duly admitted to record, and recorded in the office of the clerk of the county court of Hancock County on the 14th day of February, 1889. The lessee was, by the terms of the lease, to deliver to the lessor the one-eighth part of the oil discovered or produced, on the premises described, and to deliver the same in tanks or pipe lines to the credit of the party of the first part. The lease recites that "the sum of $4,500.00 is given and received as consideration for the above lease." McKeown, under this lease, entered upon the land, drilled two holes thereon, one of which had a small showing of oil before either of said children became of age; and in 1890, he removed therefrom with his tools and fixtures, and has not, since that time, done any further drilling for oil or gas thereon. Some time prior to the 24th day of September, 1898, said McKeown died, leaving heirs. On the day and year last aforesaid, Sarah McKeown, B. D. J. McKeown and Scott McKeown, heirs of the said John McKeown, assigned and transferred said Morrow lease to Sutton Brothers, who are defendants in this suit, which assignment was also recorded on the 17th day of October, 1901, in said clerk's office. On the 4th day of August, 1900, by their agreement in writing of that date, said Emma, Walden, and Geogre Morrow leased said one hundred and thirty-five acres of land to Wm: A. Haskell, for the period of one year,

for oil and gas purposes, with the exclusive right to the lessee of operating thereon for oil and gas. The usual royalty of one-eighth of the oil produced and saved from the premises, and $200.00 for each productive gas well, was reserved to the lessors. On the 3rd day of August, 1901, by another written agreement, by and between said lessors and lessee, Wm. A. Haskell, in consideration of one dollar, the said lease was extended for two years from the date last aforesaid, and as much longer as oil or gas should be found in paying quantities. In the early part of January, 1901, said Sutton Brothers, a company composed of Henry L. Sutton, Alden H. Sutton, Carl. E. Sutton and N. A. Sutton, took possession of part of said one hundred and thirty-five acres of land, under said McKeown lease, assigned to them as aforesaid, and commenced operations thereon in search of oil and gas. On January 19, 1901, a written notice, signed by said Wm. A. Haskell and Walden Morrow was served on Sutton Brothers, or one of them, notifying them, that Haskell held a lease for oil and gas purposes on the said one hundred and thirty-five acres of land from Emma Morrow and sons, the owners of said farm, dated August 4, 1900, and forbidding Suttons from carrying on any operations on the land for oil and gas.

On the 18th day of October, 1901, Haskell Brothers, a firm composed of said Wm. A. Haskell and Frank Haskell, (the latter being interested in the lease of August 4th, 1900), Emma Morrow, Walden Morrow and George Morrow, presented their bill in equity to the judge of the circuit court of Hancock county, duly verified by affidavit, alleging substantially the foregoing facts, and also that said Hutton Brothers had continued their operations on said land; had held possession thereof for that purpose; and were producnig oil therefrom, to the irreparable loss and damage of plaintiff, without any right or title so to do; that said Sutton Brothers had produced large quantities of oil from said land, which was then in the lines and tanks of The Eureka Pipe Line Company unsold or otherwise disposed of. The bill also alleges that the said Mc-Keown lease was and is illegal, null and void, of no binding force whatever, and did not pass to the lessee named therein the interests of said minor children in said tract of land for any purpose whatsoever; that said minors were then of full

age, and in possession of said land; and that said illegal and
invalid lease, under which said Sutton Brothers were operat-
ing, is a cloud upon the title of plaintiffs, which they are enti-
tled to have removed, and their title to said land quieted. The
said bill made the said Sutton Brothers and the Eureka Pipe
Line Company defendants thereto, and prayed that the said
McKeown lease be declared illegal, null and void; that said
Sutton Brothers be inhibited and restrained from producing
and selling any oil from said premises, and that said Sutton
Brothers, and the Eureka Pipe Line Company be required
to account for the oil produced as aforesaid; that said Sutton
Brothers be restrained and enjoined from interefering with
plaintiffs in their rightful possession of said land, and also
from the further production of oil thereform; and that the
title of plaintiff, Haskell, in and to the leasehold estate in the
oil and gas rights in said tract of land be settled and quieted,
and for general relief.

The said judge thereupon granted an injunction, which in-
hibited, enjoined and restrained Sutton Brothers, their agents,
etc., from further drilling for oil and gas upon said tract of
land; and also inhibited, enjoined and restrained the said Sut-
ton Brothers, and the Eureka Pipe Line Company from selling
or otherwise disposing of any oil, which had been run into the
lines of said pipe line company, or any oil that might be pro-
duced from the said tract of land, until the further order of the
court. On the 31st day of December, 1901, a motion was made
by the defendants in the said circuit court to dissolve said in-
junction; and the cause, as to said motion, being then heard
upon the bill, duly verified, the order of injunction, the process
duly executed and motion to dissolve the injunction, said mo-
tion was overruled and disallowed.

The answer of said defendants, Sutton Brothers, was then
filed. It admits many of the allegations of the bill, but denies
that said lease made by Emma Morrow, in her own right, and
as guardian as aforesaid, to John McKeown, was or is illegal,
null, or void, and of no binding force whatever. On the con-
trary, defendants aver that the lease, when executed, was a
valid lease, in so far as it undertook to grant to the lessee the
interest of the said Emma Morrow, as the widow of said James
W. Morrow, in the oil and gas in or under the land described in

the lease; that from the death of said James W. Morrow, until that time, said Emma Morrow, as widow as aforesaid, had been entitled to her dower interest in the land described in the lease; that until the making of the lease, she was entitled to her share by virture of her dower right, of the oil and gas; and that she was entitled to, and did by said lease, assign and convey her said interest in said oil and gas to the said McKeown.

The answer further avers that the circumstances attending the making of the said lease, and the circumstances which have since taken place, are such as to make the said lease valid in all of its particulars and details, with respect to the rights in the said land of the said George Morrow and Walden Morrow, as heirs at law of the said James W. Morrow, and to estop the said George Morrow and Walden Morrow from repudiating or denying the said lease and from interfering with said lease or the rights of these defendants thereunder. Defendants allege that when the said lease was made, the said McKeon paid the said Emma Morrow, in consideration of the making of the lease, the sum of $4,500.00, and that the said Emma Morrow treated the money so received from the said McKeown as though it belonged to the estate of the said James W. Morrow, deceased, and to her said wards as the heirs and distributees of the said estate. Defendants allege upon information and belief that there were in existence at the time of the making of the said lease, and of the receipt by the said Emma Morrow of the said $4,500.00 paid to her by the said McKeown, a number of large debts due by the said James W. Morrow at the time of his death, which were charges against his estate, and that the personal estate left by the said James W. Morrow was wholly insufficient to discharge these debts, so that they were charges upon the real property of which the said James W. Morrow died seized, and the real estate including and described in the said lease; that one of these debts, amounting to the sum of twelve hundred dollars or more, was due to one Robert Morrow, and another, amounting to the sum of twelve hundred dollars or more, was due to William A. Walden, and another for a considerable sum, although the amount is unknown to defendants herein, was due to Susan Colvig; that out of the said sum of $4,500.00 paid to her by the said McKeown, the said Emma Morrow paid and discharged the said three debts due to Robert Morrow, William

A. Walden and Susan Colvig, respectively, and that by such payment the real property, included and described in the said lease, was relieved from the lien and charge of the said debts, which, but for such payment out of the said money received from the said McKeown, would have been enforced against the said last mentioned real estate; that after the payments which were made as aforesaid upon the debts due by the estate of the said James W. Morrow, there remained in the hands of the said Emma Morrow a considerable portion of the said money paid to her by the said McKeown, and that the said Emma Morrow invested the residue for the benefit of her said wards, and that her said wards since, respectively, ariving at the age of twenty-one years have received a portion of the money which was so invested, and that a portion thereof still remains invested in the manner in which it was invested as aforesaid by the said Emma Morrow, and that the said Walden Morrow and George Morrow have been receiving the returns from such investment, and now have the ownership and control and the benefit and advantage thereof; that the said Walden Morrow became of age in the year 1891, and is now about thirty-one years old, and that the said George Morrow became of age in the year 1897, and is now twenty-five years old; that the said Walden Morrow and George Morrow both before and since they respectively became of age had full knowledge of all the facts hereinbefore set forth with respect to the said lease to McKeown and the disposition of the money arising therefrom, that they knew that the said lease had been made in the manner in which it was made, and that the said Emma Morrow had received the said sum of money from the said McKeown, and that she had expended portions of it, as hereinbefore set forth, in the payment of the said debts, and that she had invested the residue in the manner hereinbefore stated, and that the said McKeown had in good faith begun and carried forward operations under the said lease, in which he had expended a large amount of money, and that after the drilling of the first two wells the said McKeown and those claiming under him continued to assert the validity of the said lease and to claim all rights under it; and that the said McKeown heirs had transferred and assigned the said lease to these defendants, and that these defendants were in good faith claiming to be the owners of the said lease

and of the rights and property described therein; and that neither the said Walden Morrow or the said George Morrow, after coming of age, respectively, as aforesaid, either objected to the said lease as it was made, nor the exercise by the lessee, or those claiming under him, of the rights provided for in the said lease, nor to the disposition which had been made of the money received by the said Emma Morrow in consideration of the said lease, nor did either of them attempt or offer to refund to the said McKeown, or those claiming under him, the money which had been paid as aforesaid and of which they received the full benefit, nor did they or either of them in any manner attempt to repudiate the said lease. On the contrary, for years after they respectively became of age, they permitted the entire situation to stand as it had been created by the acts of their guardian as hereinbefore set forth. Defendants are advised and allege that the conduct of the said George Morrow and Walden Morrow in this regard has been such as to confirm and establish as valid the acts of the said Emma Morrow with respect to the said lease and to estop the said George Morrow and Walden Morrow from treating the said lease as, in any respect, invalid.

Depositions were taken and filed in the cause by both plaintiffs and defendants. On the 25th day of April, 1902, the cause was heard before, and submitted to, the court, and a decree was therein made and entered, declaring the said lease made by Emma Morrow, in her own right, and as guardian, to John McKeown, bearing date on the 2nd day of November, 1888, to be illegal, null and void; the temporary injunction awarded theretofore, was perpetuated; and the cause was referred to a commissioner to ascertain and report an account of the oil and value thereof, produced from the said land by Sutton Brothers. From the said two decrees, defendants appeal, and say that it was error for the circuit court to overrule the defendants' motion to dissolve said injunction; error to decree that the McKeon lease was illegal, null and void; error to declare the McKeown lease absolutely void, and to refuse to recognize, at least, the rights of defendants under it, derived from Emma Morrow's dower interest in the land.

The first question to be considered and determined is the alleged invalidity of the lease to McKeown.

In the case of *South Penn Oil Co.* v. *McIntire, et al,* 44 W. Va. 305, it is held: "Petroleum oil, as it is found in the crevices of the rock, is part of the realty, and embraced in the comprehensive idea which the law attaches to the word 'land." The only manner in which a guardian can lease or sell the land of his ward for the purpose of its development, or any other purpose, is in the manner. prescribed by statute, under a decree of the court. A guardian has ordinarily power to lease any of his ward's property of such character as makes it the subject of a lease; but, without approval of the orphan's court, he cannot dispose of any part of the realty. Oil is a mineral, and being a mineral, is part of the realty; and a guardian cannot lease the land of his ward for the purpose of its development, as it would, in effect, be the grant of a part of the *corpus* of the estate of his ward." *Wilson, et al* v. *Youst, et al.,* 43 W. Va. 826, 834; Code, chapter 83, sections 2, 12.

The said lease, tested by the authorities cited, was and is without legal validity to bind Walden and George Morrow, or either of them. As above shown, it is claimed by the defendants in their answer that said Walden and George Morrow are estopped from refusing to be bound by said lease.

It appears by the evidence that McKeown, about a year after the date of the lease to him, drilled one well on the land in which there was some showing of oil; that he then drilled a dry hole; that afterwards, in 1890 or 1891, he moved everything belonging to him from the land, and has not since operated thereon; that he has made no claim to said land since his removal therefrom as aforesaid; and that he has paid no rentals or royalties for said lease to the said Emma, Walden and George Morrow, or to either of them. The evidence proves the receipt of said $4,500.00 by Emma Morrow from said McKeown and the disbursements and use of the same by Emma Morrow, substantially as stated in said answer. It is also shown that Mrs. Morrow made objection to said Sutton Brothers coming upon the land to operate under said McKeown lease, and that this objection was made to said Alden H. Sutton, just as he was coming upon the land with the first load of materials, on the first day that they were working on the land. It is further shown that the said written notice was served on said Allen H. Sutton on the 19th day of January, 1901, after defendants—

Sutton—had material on the ground for drilling purposes, but before defendants commenced to drill. It also appears that Alden H. Sutton was informed by Walden Morrow, at the time said notice was served upon him, that the McKeown lease was invalid; that the Morrows had leased the land to Haskells, and that if the Suttons went under the McKeown lease, they would do so on their own responsibility. It does not appear that, at the time of the execution of the McKeown lease, the said Walden or George Morrow knew anything about the payment of said $4,500.00 by McKeown to their mother; but it does not appear that either of them ever received, or personally used or controlled any part of said money; or that McKeown was moved by any words or acts or representations of the Morrows, or by their silence, to take such lease, or to pay said money; but evidently hazarded his action on his own judgment. The defendants, Sutton Brothers, went upon the land, under this invalid lease, with notice of its legal invalidity. They not only held the paper by assignment, but were also notified by Haskell and Walden Morrow of the claim of plaintiffs that said lease was void. There was no lease made by either Walden or George Morrow to McKeown, and no contractual relation existed between them. So far as this record discloses, neither Walden nor George Morrow did, or omitted to do, anything that can estop them from refusing to be bound by said McKeown lease. *Williamson* v. *Jones, et al.,* 43 W. Va. 562, *et seq; Bettman* v. *Harness,* 42 W. Va. 433. The title to the oil and gas in said land could not be passed to defendants in that way.

It is also claimed by appellants that Emma Morrow had the right to convey her own interests in the land, whatever they may have been; and that under the McKeown lease defendants were entitled to all of the oil and gas rights which she owned; and were entitled to stand in her place with respect to the oil and gas in the land.

As stated in *South Penn Oil Co.* v. *McIntire, et al., supra,* p. 305, "Petroleum oil, as it is found in the crevices of the rock, is part of the realty, and embraced in the comprehensive idea which the law attaches to the word 'land.'" In *Wilson, et al.,* v. *Youst, et al., supra,* p. 834, it is also said: "So, Washb. Real Prop. p. 208, states the law thus: 'A widow is entitled to dower

in mines belonging to her husband in fee, which may have been opened during his lifetime, whether with his own hand or that of another. * * * But though she may work an open mine, under her claim of dower, to exhaustion, she may not open new ones, even within the land set apart to her as dower.' " The question is whether petroleum oil, as it is found in the rock beneath the surface, is part of the real estate in which it is found; and the same law that applies to the ownership of the surface and the soil applies to it. This question has been passed upon by the courts of last resort in different states. Gould, in his valuable work on Waters, in section 291, says: "Petroleum oil, like subterranean water, is included in the comprehensive idea which the law attaches to the word 'land,' and is a part of the soil in which it is found. * * * A lease of land, for the purpose of mining oil, coal, rock, or carbon oil, passes a corporeal interest which is the proper subject of an action of ejectment; and proportionate share of the oil to be produced by an oil well is an interest in land, a parol sale of which is void under the statute of fraud." The same doctrine is held to be the law as to natural gas. *Williamson* v. *Jones,* 39 W. Va. 226, 257.

Emma Morrow's dower in the land has never been assigned to her. In *George* v. *Hess,* 48 W. Va. 534, 537, the court says, citing 10 Am. & Eng. Ency. Law, (2d Ed.) 144: "In fact, that work, page 147, says that until actual assignment of dower, the widow cannot alien or subject her dower to the payment of debts, and that neither process of law nor her own act can transfer her right to a stranger so as to confer on him a right of action at law for the dower. She cannot convey her contingent dower." Again, on the same page, it is stated: "She is not seized of any part of the land, on the death of her husband, by any right of dower, *until* it is assigned to her." Emma Morrow, therefore, could not and did not, in the legal sense, transfer or convey her dower interest in said land to McKeown by said lease of November 2, 1888. She had no other interest in the land. The said lease to McKeown was and is void, and is of no effect as to the Morrows, or either of them. It was not ratified by either Walden, or George Morrow. In order that a contract, made during infancy, may be ratified after full age, it must of necessity be a contract merely voidable. The lease under consideration being void, cannot be confirmed. Nothing

but a new agreement, made after full age, could deprive the Morrow heirs of their land, and none such is alleged. *Dellinger* v. *Foltz*, 93 Va. 729, 734.; Mechem Law of Agency, sec. 114; Clark on Con., 724; Hammon on Con., sec. 26. The premises had been abandoned by McKeown. Sutton Brothers took no better right to the land than McKeown or his estate had thereto, under the lease, at the time of the assignment thereof to' them. The lease made by Emma Morrow, Walden Morrow. and George Morrow to Wm. A. Haskell, bearing date on the 4th day of August, 1900, is, by them, alleged to be a valid and binding contract on and between themselves, for the purposes therein stated. The Morrows were the undisputed owners of · said land, subject to the lease made to Haskell, who was legally entitled to search for and produce oil from said land. Suttons were occupying a part of the land, operating thereon and removing oil therefrom under their void lease, thus working irreparable injury to the property of plaintiffs. *Bettman* v. *Harness, supra,* 438; *Anderson* v. *Harvey's Heirs,* 10 Grat. 386. "It makes no difference, if the elements of irreparable injury be present, whether the party doing it be solvent or not." *Bettman* v. *Harness, supra,* 437. Under the adjudicated cases in this State, the plaintiffs' were unquestionably entitled to, at least, the temporary injunction, awarded to them in this cause on the 18th day of October, 1901. *Freer, et al.,* v. *Davis, et al.,* (43 S. E. R. 164) *et seq; Bettman* v. *Harness,* 42 W. Va. 433, and cases cited; 2 Snyder on Mines, secs. 1628, 1629. There is no reason stated by appellants why said injunction should have been dissolved on the 31st day of December, 1901. We see no error in the refusal of the court to dissolve the injunction at that time.

The most important question in the case to be determined is the extent to which a court of equity will take jurisdiction of, and finally adjudicate between, the parties, the matters alleged in the bill. It is urged here that the acts of the defendants are mere trespasses, for which the plaintiffs have a plain, adequate and complete remedy in an action at law. The bill alleges that James W. Morrow died seized and · in possession of said tract of land. It appears that it descended to Walden and George Morrow in fee, subject to the dower interest therein of their mother, Emma Morrow; and that plaintiffs were in pos-

session thereof. This is not denied. It is not shown that plaintiffs, Morrows, were, at any time, out of the actual possession of said land, except of such parts thereof as were occupied by McKeown and the Suttons, while they were drilling for oil as aforesaid. The evidence proves that Emma Morrow was then living upon the farm. 3 Pomeroy's Eq. Jur., sec. 1398, says: "The jurisdiction of courts of equity to remove clouds from title is well settled, the relief being granted on the principle *quia timet*,—that is, that the deed or other instrument or proceeding constituting the cloud may be used to injuriously or vexatiously embarrass or affect a plaintiff's title." But it may be contended that, inasmuch as the McKeown lease was and is void, the court will not exercise its jurisdiction to remove the cloud, for the assumed reason that there *is* no cloud. Some courts have so held; but we do not understand that to be the law in this State. In *Ambler, trustee,* v. *Leach*, 15 W. Va. 696, the Court says: "As a void judgment is a cloud upon the title of the real estate of the defendant, or his trustee, and is, therefore, calculated to produce an injury, the defendant, or his trustee, may as a general rule maintain a bill to have such cloud removed." *Johnston, et al.,* v. *Johnston, et al.,* 30 Ill. 215, 224; *Hamilton* v. *Cummings*, 1 John Chy. 517. We think the bill can be entertained in this case, not only for the purpose of the temporary injunction, but also for the cancellation of the McKeown lease, and for the removal of the cloud which it creates upon the title of the Morrows to the land. *Moore* v. *McNutt*, 41 W. Va. 695, 700; *Hoopes* v. *Devaughn, et al.*, 43 W. Va. 447; *Eckman* v. *Eckman*, 55 Pa. St. R. 269; *Hager* v. *Shinder*, 29 Cal. 47, 55; *Day Co.* v. *The State*, 68 Tex. 526, 537; 3 Pom. Eq. Jur., sec. 1399; Hogg's Eq. Pr., secs. 46, 47.

Although the McKeown lease was void, for the reason stated, it had been placed on record, and the assignment thereof to Sutton Brothers, as well; and was then asserted by said Sutton Brothers as valid and binding on the plaintiffs.

Having determined that the court can and will take jurisdiction as to the cancellation of the McKeown lease, and the removal of the cloud which it creates on the plaintiff's title to said land, and that the temporary injunction was properly awarded and continued in force, what is the further duty of the court? Must the plaintiffs be dismissed and sent to a court of

law, therein to institute and prosecute their action for the eviction of the defendants, and the recovery of damages for the trespass committed, or will a court of equity, having taken jurisdiction, go on and do complete justice between the parties? In an action at law, the court can treat the McKeown lease as a nullity, and reject it as evidence, but cannot cancel it, or remove the cloud it creates on the title of the owners of the land. That court with a jury, if demanded, can, in its generally slow and expensive way, ascertain the damages sustained by the plaintiffs, and render judgment against the defendants therefor; but it cannot restrain further acts of trespass.

By retaining the cause and adjudicating the matters in difference between the parties, a multiplicity of suits may be avoided. 1 Pom. Eq. Jur., sec. 243, says: "The multiplicity of suits to be avoided, which are generally actions at law, shows that the legal remedies are inadequate, and cannot meet the ends of justice, and therefore a court of equity interferes, and although the primary rights and interests of the parties are legal in their nature, it takes cognizance of them, and awards some specific equitable remedy, which gives, perhaps, in one proceeding, more substantial relief than could be obtained in numerous actions at law. This is the true theory of the doctrine in its application to the two jurisdictions." The author, in the same book, at section 181, says: "The concurrent jurisdiction of equity to grant remedies which are legal in cases which might come within the cognizance of the law courts is materially affected by the operation of two important principles, which are now merely stated, and which will be more fully discussed in a subsequent section. The first of these principles is, that when a court of equity has jurisdiction over a cause for any purpose, it may retain the cause for all purposes, and proceed to a final determination of all the matters at issue. For this reason, if the controversy contains any equitable feature or requires any purely equitable relief which would belong to the exclusive jurisdiction, or involves any matter pertaining to the concurrent jurisdiction, by means of which a court of equity would acquire, as it were, a partial cognizance of it, the court may go on to a complete adjudication, and may thus establish purely legal rights and grant legal remedies which would other-

wise be beyond the scope of its authority." *Hoopes* v. *De-vaughn, supra.*

Little, if anything, can be added to what has been so well stated in *Betlman* v. *Harness* as to the characteristics of irreparable · injury to real estate. We know that lands worth in the market practically nothing, a few years ago, by reason of the discovery of coal, oil or gas thereon, or near thereto, now sell for large sums per acre. While the quantity and quality of coal can be substantially ascertained by proper tests, no one can determine in advance the amount of oil or gas which may be produced; how much will be lost by unskillful or negligent operations in its production; or how much it would realize in money, were it to remain in the earth a few years longer. It will not do to say that it is to the interest of the land owner to have exploration and development of his holdings; that he generally wants his coal, oil and gas produced and marketed; and that the trespasser who takes those valuable properties,—parts of the real estate, can be compelled to respond therefor in damages. It is true that the quantity of oil or gas actually run into the pipe line may be accurately astertained, and the value thereof determined by the market value at that time; but who can measure the amount of the part, which may escape or be destroyed by conflagration or otherwise in its production? Unlike timber, coal and marble, oil and gas are "fugitive" and "volatile" in character. The owner may lease his lands therefor to a person of his own selection; but because he does so a trespasser should not be accorded the same legal rights on or to the land, as the lawful lessee thereof.

The owner is not obliged to surrender, whether he will or not, his property to another individual. The State, by virtue of its authority of eminent domain, cannot take or injure private property for public use, without *just compensation,* to the owner thereof. The trespasser should not be permitted to take the most valuable part of the freehold from the owner; waste it by his negligence or unskillfulness; then escape liability with such damages therefor, as may be ascertained and fixed by a court or jury; and afterwards, perhaps, be entirely relieved from any payment, by the use of an exemption list, under the statute, or a proceeding in bankrupty.

It is conceded that, in cases of this character, where irre-

parable injury is being done, or threatened to real estate, an injunction is proper. It may be profitable to ascertain what the courts have decided upon this question. In *Sanderlin* v. *Baxton*, 76 Va. 299, 306, the court says: "By the term irreparable injury it is not meant that there must be no physical possibility of repairing the injury; all that is meant is, that the injury would be a grievous one, or at least a *material* one, and not adequately reparable in damages. Kerr on Inj., ch. 15, sec. 1, p. 199. The injury to Baxter's land would be *material*, and disease and death merely would be grievous. For such injuries, there could be no just compensation in dollars an cents." *Moore* v. *Steedman*, 80 Va. 331, 340 and cases cited; 1 Bart. Chy. Pr. 430; *Coml.* v. *Pitts. & Conn R. R. Co.*, 24 Pa. 159.

In *Wilmuth* v. *Woodcock*, 58 Mich. 482, 485, it is stated: "The bill states a case for equitable relief The continual invasion of complainant's rights of property by the maintenance of the projection of the cornice over her north line, constituting a *permanent injury to and deprecation* of her property, addresses itself to and calls in exercise the equitable jurisdiction of the court. No remedy at law is adequate, owing to the uncertainty of the measure of damages to afford complete compensation. In one sense, it is taking her property without condemnation and without due process of law. No person can be permitted to reach out and appropriate the property of another, and secure to himself the adverse enjoyment and use thereof, which, in a few years, will ripen into an absolute ownership by adverse possession. * * * Irreparable injury in the sense in which it is used in conferring jurisdiction upon courts of equity, does not mean that the injury complained of is incapable of being measured by a pecuniary standard." *Wilson* v. *City Mineral Point*, 39 Wis. 160.

In *Western Union Telegraph Co.* v. *Rogers*, 42 N. J. 313, 314, it is said: "Again it is urged that the complainant cannot be heard in this court because the court never exercises jurisdiction unless it appears that the damages threatened are irreparable. This, it is true, is one well-settled rule; but another is equally well settled, viz: that a party will not be driven to his legal remedy where it may appear that that remedy will prove inadequate. In this case there can be no doubt but that the complainant could at law recover; but recover what?" "By

the term 'irreparable injury,' it is not meant there must be no physical possibility of repairing the injury; all that is meant is that the injury would be a grievous one, or at least a rational one, and not adequately reparable by damages at law; and by the term 'the inadequacy of the remedy by damages,' is meant that the damages obtainable at law are not such a compensation as will, in effect, though not in *specie*, place the parties in the position in which they formerly stood.  The fact that the amount of damage cannot be accurately ascertained may constitute irreparable damage.  It is no objection to the exercise of the jurisdiction by injunction that a man may have a legal remedy.  The question in all cases is whether the remedy at law is, under the circumstances of the case, full and complete." *Wahle* v. *Reinbach,* 76 Ill. 326; And. L. Dic. 546; *McMillen* v. *Ferrell,* 7 W. Va. 230.

In this suit, the parties and subject matter, are before the court; the oil produced from the land is yet in the pipe line of the defendant pipe line company unsold; the defendants threaten to drill other wells and produce more oil—take out and remove a valuable part of the land.  Must the owners of the property stand by and see a most material and valuabe portion of their land taken without authority of law, and then be compelled to go into a court of law for redress?  Can it be said that a court of equity is powerless to ascertain the value of the oil already taken; to hold and apply the proceeds of the sale of the oil on hand, to the discharge of the defendants' liability, when determined; and to perpetually restrain the wrong doers from further acts of trespass?  We think not.  The bill in this cause, tested by the authorities, can be entertained for the purposes stated therein.

There is no error in the decrees complained of.  They must be affirmed.

*Affirmed.*

DENT, JUDGE, *(dissenting)*:

The first question that presents itself is as to whether there is any equity in the bill, or are the grounds alleged mere equitable pretexts to avoid a suit at law.

The plaintiffs, Frank Haskell and William Haskell, are the oil lessees, George Morrow and William Morrow, who join in the

bill are the owners of the land, while the plaintiff, Emma Morrow, has a dower interest therein. The bill on its face shows that it is to enjoin a trespass. Its object is to determine the right of possession. The defendants are in possession operating for oil and gas. Oil lessee plaintiffs have never been in possession.

It is settled law that equity has no jurisdiction to restrain a trespass or settle the right of possession. *McMillen* v. *Ferrell,* 7 W. Va. 223; *Cox* v. *Douglass,* 20 W. Va. 175; *Schoonover* v. *Bright,* 24 W. Va. 698; *Cresap* v. *Kemble,* 26 W. Va. 603; *Watson* v. *Ferrill,* 34 W. Va. 406; *Burns* v. *Mearns,* 44 W. Va. 744; *Clayton* v. *Barr,* 34 W. Va. 260.

But it is said this is a case of irreparable damage sustained was held in broad terms without qualification that "The unlawful extraction of petroleum, oil or gas from land, they being part of the land, is an act of irreparable injury. Equity will enjoin it." This is undoubtedly the rule in cases of waste committed by the life tenant, or one joint tenant against another, for the reason that a suit at law for possession cannot be maintained, and the waste committed tends to the destruction of the inheritance. *Williamson* v. *Jones,* 39 W. Va. 231; *Tress* v. *Eclipse Oil Co.,* 47 W. Va. 107; *Anderson* v. *Harvey's heirs,* 10 Grat. 380 398. In the case of *Williamson* v. *Jones,* it was held that "Petroleum or mineral oil in place is as much a part of the realty as timber, coal, iron ore or saltwater." Hence the same rules which apply as to the taking of the one should apply as to the taking of the other. The extraction of petroleum oil is no more an irreparable injury to land than to dig coal or cut down timber. As it is said in *Bellman* v. *Harness,* "The word irreparable means that which cannot be repaired, restored, or adequately compensated for in money, or where the compensation cannot be safely measured." Under this rule irreparable damage can never be done by the extraction of petroleum oil when it is run into the pipes of and measured by a pipe line company, for the true quantity and value thereof is ascertained and determined by the market standard and unless the extraction of the oil and the pipe line company are both insolvent there is no danger of loss to the owner of the oil. But it is said, is not the owner of the oil entitled to keep "his own oil in

his own soil?" Yes, but so is the owner entitled to keep his own timber on his own land, and his own coal in his own coal bank. And undoubtedly, where the owner is not in such a legal situation that he can sue for possession and the act complained of tends to the waste and destruction of his estate or inheritance, he may sue in equity. On the other hand, where he is in condition to sue for possession, and there is no possible danger or loss, the damages being easy of pecuniary estimation, and the parties liable therefor perfectly solvent, the remedies at law are sufficient and adequate, it matters not whether the substance involved is oil, coal, iron ore, or timber.

When the owner of land has granted away the right to extract the oil, he can no longer complain that he is injured by the unlawful extraction thereof, especially if he is secure in his royalty. For having released his right to retain the oil in place, its extraction can no longer be said to be destructive of his estate either in remainder or reversion, or that the injury is remediless. *Koen* v. *Bartlett,* 41 W. Va. 559. The right left to the owner is the receipt of the royalty, and this being secured to him under both the subsequent and prior leases, he can be in no wise injured by the extraction of the oil, whether done by the prior or subsequent lessees. The owners of the land in this case are in no danger of loss, for under both leases, their royalty is secure to them, and they have wholly parted with their right to have their oil retained in place. Their royalty in both instances they receive through the pipe line. Hence as to them, no irreparable injury has or can be inflicted by the extraction of the oil. Nor are they liable on a warranty, express or implied as against the prior lease, for the subsequent lessees took their lease subject to and with full notice of prior lease as the allegations of the bill plainly show, and were themselves to have such prior lease declared invalid. The subsequent lessees are also without right to maintain this suit. They have no interest in the oil in place. Their only interest is to have it severed and reduced to possession. The severance by the prior lessees cannot possibly be injurious to them, much less irreparably so. For if it is their oil, they can claim it in the pipe line, where it is perfectly safe. The question of insolvency, either as to the defendants or pipe line is not even mooted. It is said their lease

is in effect a grant of a part of the *corpus* of the land. This in a limited sense is true, for it is a grant of the right of severance of a part of the *corpus* of the realty. So is a grant of standing timber, yet such grant amounts to a severance thereof, and converts such timber into personalty from realty. *Warren* v. *Leland*, 2 Barb (N. Y.) 613. So the grant of the right of severance of oil converts the oil that may be after discovered and severed into personality, but on account of its peculiar nature and hidden condition, the lessee acquires no estate in the oil in place. Nor has he any right to keep it there. His interest is not to do so, but it is his duty to sever it at once, or as soon as practicable, and reduce it to possession, and then it becomes his property, less the royalty. He may have the right to the possession of the land, and of the oil produced. Both these he may acquire by proper suit at law. The severance of the oil and conversion into personalty takes place at the date of this lease, but on account of its fugitive and volatile character, it does not become his property until reduced to possession by himself, or some one else. *Dark* v. *Johnston,* 55 Pa. 164. An unlawful severance thereof by prior lessees which inures to his benefit can in no wise injure him, nor should he be heard to complain with regard thereto. If a person has the lawful right to cut timber and another cuts it for him by mistake or unlawfully, the former who receives the benefit thereof, has no grounds of complaint, nor has the land owner, who receives his full pay for such timber, the severance of which he has authorized. In the case of the *Oil Co.* v. *Gas Co.,* 51 W. Va. 584, it was held that the discovery of oil vests no title to it in place in the lessee, but does vest in him the right to produce and take the same in accordance with the terms and conditions of the contract. *Steelsmith* v. *Gartlan,* 45 W. Va. 27. An oil lessee has no property in the oil in place, but only the right to extract the same and reduce it to possession, when it becomes his personal property, the value of which can be pecuniarily ascertained, and the loss thereof fully compensated. *State* v. *South Penn Oil Co.,* 42 W. Va. 80, 102; *Carter* v. *Tyler County Court,* 45 W. Va. 806; Baringer and Adams, Mines & Minnig, 74, 75; *Oil Co.* v. *Fretts,* 152 Pa. St. 451, 456 (25 Atl. 732) ; *Funk* v. *Halderman,* 53 Pa. St. 229; *Thompson's Appeal,* 101 Pa. St. 225, 232; *Rynd* v. *Oil*

*Co.,* 63 Pa. St. 397; *Duffleld* v. *Hue,* 129 Pa. St. 94 (18 Atl. 608) ; *Duke* v. *Hayne,* 107 Pa. St. 57; *Horner* v. *Leeds,* 25 N. J. Law 106; 2 Shars. & B. Lead Cas. Real Prop. 30. His only interest in the land is purely a chattle interest. 5 Am. & En. En. Law (2d Ed.) 1022. He has the right to possession of the land. This he can obtain and preserve by suit at law. He has the right to the oil as personal property when severed from the real estate. For the wrongful deprivation of this he can sue in trover and conversion and be compensated in damages. Or if it can be identified he can sue in detinue for its possession. Hence the subsequent lessee plaintiffs were not the owners of the oil in place either absolutely or in reversion, nor had they any inheritance therein. As to them the oil should be treated as personal property, and for the unlawful taking thereof they have full and adequate remedies at law, towit, detinue and trover and conversion. *Hall* v. *Reed,* 15 B. Monroe, 479; *Hughes* v. *United Pipe Lines,* 119 N. Y. 423; *Silsbury* v. *McCoon,* 3 N. Y. 379. As to the land, if they have the right of possession, and are unlawfully kept out of the same, they may regain the possession by action of unlawful detainer or ejectment. *Guffey* v. *Hukill,* 34 W. Va. 52; *Schamp* v. *Hukill, Id.* 375; *Thomas* v. *Hukill, Id.* 385.

Nor does the right to annul the defendants' lease as a cloud on plaintiff's title give equity jurisdiction. The subsequent lessees whose title is affected by the prior lease never have had possession of the land, while the defendants are in possession thereof. *Moore* v. *McNutt,* 41 W. Va. 695. "The possession sufficient to support the action is generally limited to peaceable possession rightfully acquired." 17 En. Plead. & Prac. 317. "Such a bill is only entertained by a court of equity because the party is not in a position to force the holder of, or one claiming to defend under an adverse title into a court of law to contest its validity, and this as a genral rule, is the test to which a court of equity will look to determine whether the necessity of the case requires its interference." *Alton* v. *Buckmaster,* 13 Ill. 205; *Smith* v. *McConnell,* 17 Ill. 135; *Comstock* v. *Newbury,* 66 Ill. 214; *Apperson* v. *Ford,* 23 Ark. 757. If the plaintiffs can sue at law, and the defendant gives them the opportunity to sue at law, they must sue at law There was nothing in the way of the plaintiffs suing at law.

They were out, and the defendants in possession and keeping them out. Nor is there any necessity of a multiplicity of suits, as one suit would have finally settled this controversy Nor does the bill show sufficient grounds to demand an accounting. A bill in a proper case through the necessity of discovery will lie to compel an accounting of the proceeds of mines, etc., because the defendants have peculiar knowledge thereof. *Swearingen* v. *Steers,* 49 W. Va. 312. This necessity is obviated in cases of oil wells, by reason of the pipe line company, which keeps accurate accounts of oil produced. It is indifferent as between the parties and doubtless on application will furnish a true statement of the oil produced without the necessity of a resort to a discovery. If the pipe line company should refuse a disclosure on proper demand, such a bill might become necessary. There is, however, no allegation of this kind in the present bill, but all that is said with regard to the matter is mere pretense.

The four grounds on which equity jurisdiction is sought to be maintained, towit: irreparable damage, cloud on title, multiplicity of suits and the necessity of an account are mere pretexts to foist on equity a jurisdiction it does not possess, and this is the determination of the right to possession of land.

Nor does the fact that the first lease is void deprive the law of its jurisdiction. *Gall* v. *Bank,* 50 W. Va. 597; *Davis* v. *Settle,* 43 W. Va. 19, 37.

The case presented is simply the ordinary case of property claimed by one party in the possession of another party. It is a mere ejectment bill, and there is nothing to give a court of equity jurisdiction. Messimer's Appeal, 96 Pa. St. 169. Nor is the taking of the oil from the wells under the facts of this case to be adjudged such an irreparable injury as in some cases might warrant the interference of a court of equity. *Erskine* v. *Forrest Oil Co.,* 80 Fed. Rep. 583. "A bill to quiet title in complainant to an oil claim under the placer mining laws, which alleges that defendants have entered upon the ground and have extracted and removed oil therefrom, and are engaged in sinking a well thereon, and which asks an injunction to restrain them from proceeding with such work and from taking and removing oil, is in effect a bill to obtain possession and admits the possession of defendants; hence, it

is not cognizable by a federal court of equity, the remedy being at law." *Oil & Gas. Co. v. Miller,* 96 Fed. Rep. 12. The only object of the bill in the present case stripped of all its false pretenses of irreparable injury, cloud on title, multiplicity of suits and accounting demanded is to try the right of property and dispossess the defendants. In no other kind of a case except an oil case would this Court for a moment entertain such a bill, but oil is so lubricating that it sometimes causes the wheels of justice to slip a cog, and if the guardians thereof are not on the alert it may cause oleaginous construction of principles of equity to produce more irreparable damage than it prevents.

Nor have the plaintiffs acted with that diligence in presenting their claim that would entitle them to equitable consideration. They were aware shortly after defendants had taken possession and were about to drill for oil that defendants were doing so under a claim of right, and they might have by legal proceedings at once tested such right, yet they waited for about eight months, until defendants were actually engaged in producing oil before they complained to a court of equity. In short, they wanted the oil produced before interfering, and now that it is being produced, they claim they are suffering irreparable damage, for the reason that the oil is not left in place—a mere pretense to gain the equitable ear of the court.

The bill should be dismissed and the plaintiffs remitted to their legal remedies.