# CHARLESTON.

## CARNEY v. BARNES.

Submitted September 9, 1904. Decided December 20, 1904.

1. CHANCERY JURISDICTION.—*Covenants Broken.*
   Chancery has jurisdiction to cancel a deed granting petroleum oil for failure to perform its covenants, where the deed has a clause annulling it for such failure. (p. 589).

2. EQUITY JURISDICTION.
   Touching equity jurisdiction to cancel a deed for realty or a contract for mere failure to perform its covenants, when there is no clause of forfeiture for such failure. (p. 586).

3. EQUITY JURISDICTION.
   Touching equity jurisdiction to cancel a deed void on its face and deeds made void by evidence outside the deed. (p. 587).

4. EQUITY.—*Remedy at Law.*
   To deny equity jurisdiction because of a remedy at law, the legal remedy must not be merely partial, but it must be adequate, and as complete and efficacious as that given by equity. (p. 588).

Appeal from Circuit Court, Wetzel County.

Bill by Eli Carney and wife against George W. Barnes and others. Decree for plaintiffs. Defendant Barnes appeals.

*Reversed.*

A. McGEE HALL and T. P. JACOBS, for appellant.

E. L. ROBINSON and E. B. SNODGRASS, for appellees.

BRANNON, JUDGE:

Eli Carney and wife made a lease 3d February, 1898, to E. H. Jennings & Brothers for oil purposes of a tract of land, the lease providing that the lessee should give to the lessors one eighth part of the oil produced, to be set apart in the pipe line to the credit of said Carney and wife as royalty or rent.

Jennings & Brothers bored two oil wells on the land, getting oil, which was run into the pipe lines of the Eureka Pipe Line Company. Before operations for oil production were begun Carney and wife, 6th September, 1900, made a deed conveying to George W. Barnes all the oil in said land except one sixteenth; but the deed recognized the existence of said oil lease to Jennings & Bros., and provided that if that lease should expire or become void under its terms, then Barnes should have all the oil with the right to produce it on the usual terms of leases for oil and gas purposes. Thus the deed to Barnes operated to give him half the eighth, Carney retaining one half. For the said conveyance Barnes paid Carney a bonus of $3,000 cash, and the deed provided that Barnes should, within thirty days after the first well, and thirty days after the second well should be completed, tubed and tested for oil, pay to Carney $2,000 for each well, if it produced ten barrels of oil per day for thirty consecutive days, Carney to give notice to Barnes by writing of the wells being drilled and the amount of their production.

The said deed from Carney to Barnes contained this clause: "If said grantee shall, as he may do at his option, omit to pay the said sum of $2,000 for the first well within the time aforesaid, except as hereinafter mentioned, then this grant shall become as absolutely null and void as though it had never been made, and said grantors shall retain the sum above mentioned as full liquidated damages."

As above stated oil was produced in the two wells bored by Jennings & Bros. As to the quantity there is conflict of evidence, some of it tending to show less than twenty barrels per day and some of it showing twenty-two barrels per day. Barnes never was on the ground, but the said deed to him from Carney

was taken by an agent, Umstead, who transacted for Barnes all that he did with Carney in this matter. Carney demanded of Barnes, who lived in Ohio, by letters, payment of the $2,000 for each of the wells as stipulated in the deed from Carney to Barnes, Carney claiming that the wells produced over ten barrels of oil per day each so as to entitle him to said money under his deed. Barnes refused to pay the money, claiming that he could not afford to do so. He says that he was under the impression that the deed required the wells to produce thirty barrels a day before he was called on to pay the money. While the matter was in this condition Umstead went to Carney to make some compromise and told Carney that Barnes could not afford to pay $2,000 each well, and proposed a compromise by which Barnes should pay $2,000 instead of $4,000, and if the third well should be drilled producing twenty barrels a day for thirty days, then Carney should receive $1,000 more. This compromise was reduced to writing and was signed by Carney and wife and sent to Barnes in Ohio. Barnes refused to accept it, and returned it to Umstead, Barnes claiming that no compromise was necessary as the wells did not produce oil in such quantity as to demand anything from him. Carney and wife then brought a suit in equity against Barnes, Jennings & Bros. and the Eureka Pipe Line Co. alleging that the said oil wells had produced more than ten barrels each for thirty days, and that though they thus became entitled to said $2,000 for each well, yet Barnes had refused to pay the same, had broken his contract, and that under the clause of the deed above quoted the deed had become null and void by reason of the refusal of Barnes to pay the money. The bill prayed that Jennings & Bros. disclose when each of the wells began to produce oil, and what quantity they produced per day for thirty days after their completion, and what amount they had produced since they began to produce oil; what oil from the wells had been received by Barnes, and what oil had been run from the wells into the pipe lines of the Eureka Pipe Line Co. The bill alleged that a division order certifying the right of Barnes to one sixteenth and of Carney to one sixteenth of the oil had been issued by said Pipe Line Co. and it prayed that that company file a copy of it. And it prayed that said Pipe Line Co. state in what proportion the oil was divided, and who received credit thereof, and state the times when Barnes sold oil produced from the

wells, and what he received therefor. The bill also prayed that the deed from Carney and wife to Barnes be declared by decree to be null and void, and that the court ascertain through a commissioner the amount of oil received by Barnes, and what oil he sold from the wells, and what money he received therefor, and that a money decree go against Barnes for money arising from his sales of such oil. The bill also prayed that the Eureka Pipe Line Co. be enjoined from accounting for or turning over to Barnes the oil already in its lines, or that might thereafter come into its lines from the said wells. An injunction was granted.

The bill prayed also for general relief. Barnes filed an answer to the effect that the true agreement between Carney and wife and Umstead as agent was as appears in the deed from Carney and wife, except in one particular, that is, that whereas that deed required him to pay $2,000 for each of two wells producing ten barrels per day, it should have provided that the wells should produce thirty barrels per day; that the said deed should in that place read "thirty barrels," not "ten barrels." His answer states that he was engaged in the business of buying oil royalties in West Virginia and elsewhere, and that he had blank deeds prepared to facilitate the execution of papers showing the purchase of royalty, and had furnished Umstead with a number of such blanks, and that Umstead had used one of those blanks in said transaction with Carney. He states that the agreement between Umstead and Carney and wife was in that respect for wells producing thirty barrels, not ten, and that the presence of the word ten in said deed was due to a mistake in the omission to strike out the printed word "ten" from the blank and insert in its place the word "thirty." The answer stated that the matter was overlooked by Umstead and also by said Barnes when the deed was sent to him. Barnes stated that in instruction to Umstead he directed him to require a minimum production from thirty to thirty-five barrels per day for thirty days where the sum of additional money for wells was of the amount specified in the deed. The answer further states that the territory in which said wells were bored was known to be Gordon or deep sand territory, wherein the drilling of wells would cost $8,000 to $10,000 each, and that wells producing less than thirty barrels per day would be unprofitable, and that operators under

leases in that territory would refrain from drilling therein, and that wells producing more than thirty barrels would induce operators to further develop the territory, and that the payment of $7,000 for wells of less than thirty barrels capacity would be unreasonable. The said answer denied that Carney had ever given him notice of the true quantity of oil produced by said wells as stipulated in said contract. Said answer averred that the actual production of the first well on said land was between sixteen and seventeen barrels per day, as shown by the reports of the Pipe Line Co., and that neither the first nor the second well produced at any time as much as twenty barrels per day each. Barnes denied that the said deed from Carney and wife to him had become void, and denied that he owed anything to Carney and wife by reason of the said wells, and he prayed that as the said deed from Carney and wife to him did not express the true agreement between them and him, it be reformed and the word "ten" be stricken out and the word "thirty" inserted in its place. The court made a decree which declared the said deed from Carney and wife to be null, void and forfeited on account of the provisions contained in it, and the failure of Barnes to comply therewith, and denied to Barnes the reformation of the said deed sought by his answer, and referred the cause to a commissioner for a report as to the oil which had been received by Barnes as preparatory to a decree against him on that account. The decree perpetuated the provisional injunction which was awarded restraining the Pipe Line Co. from turning over to Barnes oil produced from said wells, and required it to account to Carney and wife for all oil in its lines on the date when the injunction was served upon it, and directed such oil and all oil produced in future from the wells to be credited by the Pipe Line Co. to Carney and wife, and declared Carney and wife entitled to all the oil in the lines at the date of the injunction or thereafter produced going to Carney and wife under their said lease to Jennings & Bros. From this decree Barnes has appealed.

Barnes contests the jurisdiction of equity to entertain this suit alleging that Carney and wife have adequate remedy at law. We are not aided with any authority cited upon this proposition, though we have had some difficulty with it. We have, however, concluded that equity has jurisdiction for the purpose of cancellation of the instrument that is attacked. We

find in 6 Cyc. 286 that, the equitable remedy of cancellation is within the exclusive jurisdiction of equity, because equity courts are alone able to decree it, notwithstanding the facts which are the occasion for cancellation are many times available by way of a law action or defense. Where cancellation is the only remedy that is full and complete for all the purposes which may arise, equity cannot be denied its jurisdiction. It is abundantly sustained. In *Hyet* v. *Shull,* 36 W. Va. 563, this Court sustained equity jurisdiction to cancel a promissory note given by an old man incapable of executing it. JUDGE HOLT said, what will appear to any body reading the books, that they all sustained the jurisdiction of equity for cancellation where no other remedy is adequate, no matter how guardedly equity may exercise the power in some instances. He said that on this branch of remedial justice there is a wide interlock of jurisdiction. No matter that a law forum will administer partial relief. It is of no force to say that if the oil wells involved in this case produce oil sufficient to call for the payment by Barnes spoken of in the deed, and he refused payment, that refusal alone worked the nullification of the deed, and it became at once void, without any decree. It was once thought that a forged deed being void, or an instrument void for any cause, could not be canceled in equity, because a thing already void need not be adjudged to be void, but its voidness may be shown whenever it comes in question; but that idea has been frequently refuted in equity, and it is now well settled that though an instrument be void, that fact does not oust equity of its jurisdiction for cancellation. *Hoopes* v. *Devaughn,* 43 W. Va. 447; *Haskell* v. *Sutton,* 53 W. Va. 206; *Alexander* v. *Davis,.* 42 *Id:.* 465, 467. "Whatever may have been the doubt or difficulties formerly entertained upon this subject, they seem by the more modern decisions to be fairly put at rest, and the jurisdiction is now maintained to its fullest extent. And these decisions are founded on the true principles of equity jurisprudence, which is not merely remedial, but is also preventive of injustice. If an instrument ought not to be used or enforced, it is against conscience for the party holding it to retain it, since he can only retain it for some sinister purpose." Story, Eq. section 700. Mr. Hogg in his Equity Principles 80, puts this healthful jurisdiction upon logical, sound basis in saying that it rests on the principle of *quia timet,* that is, equity acts because

of the reasonable fear that the instrument may be vexatiously or injuriously used when evidence to impeach it is gone, or that it may be already, as in our case, clouding title, or affecting the interest of the party. He says that. the jurisdiction is firmly established.

There is no jurisdiction where the face of the instrument speaks its voidness. 6 Cyc. 290; 18 Ency. Pl. & Prac. 759; Story, Eq. section 700. *Rich* v. *Braxton,* 158 U. S. 375, holds that, where the face of a deed tells its voidness, or the claimant under it must, to use it, inevitably prove facts showing it to be void, equity has no jurisdiction to cancel; but where evidence outside the deed is required to prove it void, equity jurisdiction is conceded. Such outside evidence would be required as to the deed involved in this case.

Now, it is true that these principles are applied to instruments void from their beginning, which never had any force; whereas the deed in this case was valid when executed, and only become void afterwards by reason of a condition subsequent incorporated in it; but what difference is this? It has become void, and there is just as much danger of its being used to vex its makers, to cloud their title, to put them in danger, to injure the sale of their property, as if it had been void from the first. What the party needs, and what equity concedes him, is a formal adjudication of a court utterly destroying the deed, and rendering it ineffectual in future whenever relied upon. A law judgment cannot do so. As the opinion says in *DeCamp* v. *Carnahan,* 26 W. Va. 839, in a case like the one at bar, the remedy is not so full, adequate and complete at law as in equity. The parties will be obliged to rest, if the Court holds that the deed sought to be removed as cloud on the title is void and cancels it; if the Court refuses to cancel because the deed is good, they must also rest; for in either case the question is settled. I am outspoken to say that I have always favored equity jurisdiction in such cases, because it gives the only adequate relief. Partial, incomplete relief a court of law may give, but a decree in equity wipes away the dangerous instrument, takes away its life. Is this not a plain case calling for equity jurisdiction? If Carney were entitled to relief, how could he get it at law? Suppose he sues Barnes for money received by him for oil, and sustains his action because the deed has, by its terms, come to an end, and he recovers. The decision would likely be *res ju-*

*dicata* betwen them and settle that the deed had become void when pleaded in a future action for oil later produced; but would that have the effect of preventing Barnes from getting oil in future, or prevent the necessity of a future action, or be effective to compel Jennings & Bros. to pay the oil in future to Carney, or compel the Pipe Line Co. to credit him with it? They not being parties would not be bound by these judgments. What Carney wants is an adjudication which will bind all the parties, and show that the deed is void and compel Jennings & Bros. and the Pipe Line Co. to so treat it and refuse to give credit for any oil to Barnes, and acknowledge Carney as the owner of the whole royalty oil. You could not make the Pipe Line Co. or Jennings & Bros. parties to an action by Carney against Barnes for the money produced for the oil. I do not see that the Pipe Line Co. could be sued for the oil by Carney.

The judgment of recovery of money by Carney against Barnes might be introduced as evidence of Carney's title in an action by him against the Pipe Line Co. in *trover, detinue* or *assumpsit*, granting that one or more of those actions would lie against the Pipe Line Co., but the recovery would not operate as an estopel against that company. Carney wants a decree which will, at one stroke, destroy the deed, declare his right to all the royalty, and compel those companies to recognize his right, making the decree *res judicata* against all of them. To deny chancery jurisdiction because of law remedy the law remedy must be as complete as that afforded by chancery. *Rich* v. *Braxton*, 158 U. S. p. 407; Hogg Eq. Principles, 5; *Nease* v. *Ins. Co.*, 32 W. Va. 283.

Here is a deed passing a present estate, a vested estate, containing a condition subsequent to defeat the deed upon the contingency of Barnes failing to pay money, his non-performance of a material condition. Has not Carney a right to call upon a court to ascertain and declare that Barnes has not performed that condition, and not leave it to controversy and doubt? We find it laid down in 6 Cyc. 288, that, "Non-performance by the defendant has occasionally been treated as a sufficient ground for rescission of a contract by decree in equity; but the weight of evidence is against this view. Thus a conveyance of land in consideration of the grantee's agreement to support the grantor during life will not, according to the weight of authority, be canceled for the mere failure to fulfill his con-

tract, unless such failure amounts to the breach of a condition subsequent, in which case the deed may be canceled." From this we may understand that there are authorities of great repute, cited in Cyc., showing that even where a paper contains a simple obligation on a party to do a certain thing, equity will cancel the paper. Among the cases cited is *Farmers' Co.* v. *Galesburg,* 133 U. S. 156, where a contract to supply a city with water was canceled in chancery for mere failure of performance.

But in this case there is a positive provision in the deed that non-compliance shall work the death of the deed, and surely under the rule stated in Cyc. there cannot be a doubt of the power of equity to cancel the deed for non-performance with a subsequent condition, which by that deed, in express words, is to end it. In *Pownal* v. *Taylor,* 11 Leigh 172, it was admitted that if a covenant in a deed for support is not complied with, and the deed provides that it shall become null on that account, it would be avoided. We have cases in Virginia and West Virginia holding that failure to comply with a material provision of a deed is often ground for equity to cancel it, as for failure to support the grantor. *Lowman* v. *Crawford,* 40 S. E. 17, 99 Va. 688. *Wilfong* v. *Johnson,* 41 W. Va. 283, cancels a deed for support without such clause. *Goldsmith* v. *Goldsmith,* 46 W. Va. 426, cancels a deed containing a forfeiture clause. In the absence of a clause in words defeating a deed for non-compliance with its provisions, I would limit equity jurisdiction to cases where cancellation affords, in the particular case, the only full and complete relief. In this case the deed provides that non-performance shall work its death, and I have no doubt of the right of Carney, if he had good cause, to appeal to equity to give him the only full relief suitable to this case.

But though there is equity jurisdiction, we hold that Carney and wife are not entitled to the relief they ask. We are of the opinion that the provision of ten barrels in the deed does not state the true contract as made between Umstead and Carney, and that it ought to contain the word "thirty" instead of "ten." Carney now contends that the contract was ten barrels; but his evidence and a letter from him are inconsistent with this position. He says that a few days before the execution of the deed he and Umstead made the contract; that Umstead asked him what quantity should be put in the clause specifying the quan-

-tity, and he said to Umstead that he might take his choice of ten, fifteen or twenty barrels, and that Umstead said he would -fix that when he came back, and that Umstead left ten barrels in the contract and that he, Carney, did not notice it until he later looked over it. Carney does not say, by no means does he :say, that there was a distinct agreement for ten barrels. He :simply says that Umstead left the word ten in the contract without his knowing it. Strange that he did not have his mind on that important matter so as to tell us that the agreement was for ten barrels, if in fact it was. I repeat that Carney does not tell that ten barrels was the contract. Carney in his exam- :ination in chief said they did not settle on any number. He ·also said that he was surprised when he became aware that the ·contract had the word ten in it. That negatives all idea that the word ten had been agreed upon. On cross examination he ·stated that he got a copy of the contract from Umstead some months after its execution and was surprised that it contained the word ten, and the question was put to him, "And you thought all the time that the contract contained twenty bar-- rels?" and he answered, "This is what I thought. That is why I wrote Mr. Umstead that letter." He was then asked, "you con- ·ceded that the contract should rightly contain 20 barrels and be the contract?" and he answered, "We talked the 3 proposi- ·sitions, 10, 15 and 20, ·and there was neither proposition set- tled down on, and Mr. Umstead said that he would fix that when he came back, and he did, he left it 10 barrels, and I didn't notice that in the contract until I looked over it." He was then asked, "He had the right to put in 20 barrels though?" and he answered, "He had. the right to; I would not have ob- .jected." Carney wrote Umstead a letter reading as follows:

"Silverhill, May 1, 1901. Mr. Umstead dear sir received your letter and signed that paper and will mail it today. I am sur- prised in regard to that contract for I was sure in My Own Mind that it was 20 barrels instead of 30. I am satisfied that the well was to be tested for 30 days and the production 20 barrels but was surprised to see the contract not changed from 10 to 20 I wouldn't argue the point when you was out here for I thought all that was necessary was to look up the contract. Eli Carney."

That was written when he sent Umstead the compromise -contract. All this shows conclusively that ten barrels was not

agreed upon, and that Carney so understood it, and we must therefore eliminate the provision of ten barrels from the deed. Then the question arises what shall be done? Shall we say that the minds of the parties never met upon the subject of the quantity of oil which the wells were to produce to demand from Barnes the additional compensation of $2,000 per well, and cancel the contract because a material element was left out, and therefore there was no contract? Or shall we insert a quantity? If we adopt the former decision, Carney would have to refund the $3,000, and Barnes account for what oil he got. If we conclude not to adopt this decision, but to reform the deed by inserting the number of barrels, what number shall we insert? Carney says he *thought* the contract said twenty barrels, but he does not say that was actually agreed upon. Umstead swears positively that thirty was the number agreed upon. Though this is denied by Carney, the evidence of Umstead is to be preferred to that of Carney, because the claim of Carney that no quantity was agreed upon is very unlikely. It is unlikely that they would omit to decide upon an element of the contract so important. It is very unlikely that Umstead would not be particular to have definite understanding about a matter on which such a large sum of money was to be payable, and on which Barnes had given him direction. Carney swears to no sum. Umstead swears to a particular sum. Umstead is disinterested, while Carney has thousands of dollars involved and is deeply interested. It is so hard to believe that so important a matter as the quantity of oil should not be agreed upon when thousands of dollars were dependent upon it. It is not unlikely that Umstead forgot to strike out the word "ten" from the printed form and insert the true quantity in its place. From common experience we can realize how he might overlook that little word ten. And it is so improbable that Umstead would pay seven thousand dollars for two little wells of ten or even twenty barrels production. The evidence in this case shows that the production would not justify that price. Umstead had instructions not to pay such a price for wells of less than thirty barrels capacity. This induces the belief that he did not depart from instructions. A fact which goes to confirm Barnes' claim that the wells must yield thirty barrels a day is, that the first well struck oil 16th March and Carney wrote Barnes 29th March that it would produce 40 to 50 barrels, inducing the

belief that he wanted to produce the impression that it exceeded
thirty barrels, the amount Umstead said was agreed on. He
had not the contract then. After he got a copy, and saw the
ten in it, he wrote a second letter telling Barnes it produced
twenty to twenty-five barrels. So we hold that the deed should
have contained the word thirty instead of ten, and that it
should be reformed accordingly. Though such reformation is
now useless, because of the lapse of thirty days from the com-
pletion of the wells, we will decree such reformation, and re-
verse the decree of the circuit court and deny the plaintiffs.
the relief sought by their bill and dismiss their bill and dis-
solve the injunction.                                  *Reversed.*