# Richmond.

## ROPER AND ALS. V. McWHORTER AND ALS.

## ROPER AND ALS. V. BALLENTINE AND ALS.

### February 15th, 1883.

1. CORPORATIONS—*Tax-payers—Injunctions.*—The right of tax-payers to resort to equity to restrain municipal corporations and their officers, and *quasi* corporate bodies and their officers from transcending their lawful powers or violating their lawful duties in any way injuriously affecting the tax-payers, such as making unauthorized appropriations of the corporate funds or an illegal disposition of the corporate property, is well established.

2. IDEM—*Alienation of franchises.*—Without legislative authority they cannot lease or alien any franchise necessary to perform its obligations and duties to the state.

3. IDEM—*Construction of charters.*—It is a well settled rule of construction of legislative grants to public or private corporations, that they can exercise only such powers as are conferred expressly or impliedly by the act, and that in all cases of ambiguity, the doubts shall be resolved in favor of the public.

4. IDEM.—*Franchises* in this state have always been granted with a view to subserve the public, and are deemed public trusts, to be regulated and managed by the legislature through its different agents.

5. IDEM—*Case at bar.*—In September, 1881, the board of supervisors of Norfolk county and the council of the city of Portsmouth leased to R., for twelve years, the Norfolk county ferries at $13,000 per annum.

HELD:

    1. Neither under the general or statutory laws of this state did the said board and council, or either of them, possess the authority to lease the said ferries.

    2. The *jus disponendi* is not incident to the ownership of property as a public trust.

3. The boards of supervisors, like other corporate bodies, are the creatures of the statute, and have no other powers than those conferred expressly or by necessary implication. .

4. No powers devolved on those boards as the successors of the county courts.

6. IDEM—*Idem.*—Even had the power existed in the board and council to execute this lease, yet the circumstances attending its execution justified its annulment

Opinion states the case.

*John S. Wise, Holladay & Gayle, Walke & Ould,* for appellants.

*J. F. Crocker, Burroughs & Bro., C. W. Murdaugh,* and *F. S. Blair,* for appellees.

HINTON, J., delivered the opinion of the court.

This is an appeal from a decree of the circuit court of Norfolk city, entered in the vacation of said court on the 30th day of September, 1882, in two certain chancery causes which were consolidated and heard together.

The first being a suit by W. A. McWhorter and als., citizens and tax-payers of the county of Norfolk and of the city of Portsmouth, members of and constituting the ferry committee of the Norfolk county ferries, suing for themselves and all other members of the said ferry committee, plaintiffs, against John L. Roper and others, defendants; and the second being a suit by M. T. Ballentine and others, suing for themselves and all other citizens, property owners and tax-payers of Norfolk county, and A. H. Lindsay and others, citizens, property owners and tax-payers of the city of Portsmouth, suing for themselves and all other citizens, property owners and tax-payers of the city of Portsmouth, plaintiffs, against John L. Roper and others, defendants.

The object of both of these suits was the same, namely, to have the said Roper and his agents, and the members of the

said council of the city of Portsmouth and the members of the board of supervisors of the county of Norfolk enjoined and restrained from taking possession of the "Norfolk county ferries," and the property thereof under and by virtue of a lease executed by the board of supervisors of Norfolk county and the council of the city of Portsmouth, to the said John L. Roper, on the 13th of September, 1881, for the term of twelve years thence next ensuing, at a rent of $13,000 per annum, and also to have the lease declared null and void, and cancelled.  In their bills, the plaintiffs allege, amongst other things, that Norfolk county and the city of Portsmouth are the joint and equal owners of the "Norfolk county ferries," and of the dock, wharves, buildings, boats and other property used in connection therewith for ferry purposes.

That the ferry franchise and property are very valuable; that the gross annual receipts thereof amount to about $50,000, and are rapidly increasing; that the property is the source of large revenues to the said county and city, which go to lessen the burdens of taxation to the.plaintiffs and the other tax-payers of said county and city; that the said ferry is, and for some time has been, under the regulation and management of a committee of six, three of whom are appointed, as prescribed by law, by the judge of Norfolk county court, and the other three by the judge of the court of hustings of the city of Portsmouth.   They then aver the execution of said lease, that it is greatly to the injury of themselves and the other citizens and tax-payers of said county and city; that it is for a rental not only grossly inadequate, but that it is for an amount much less than the said board of supervisors and the said council could easily have obtained, had they acted fairly and properly in the matter of making the lease.   They charge, with many circumstances of aggravation, that certain members of the board of supervisors and of the council, constituting a majority of both bodies, and controlling the actions thereof, acted in making said lease unfairly and in bad faith in relation to the

public trust committed to them, and as the legal officials of said county and city. That they had combined and confederated with Roper, his agents and attorneys, to conceal from the judges of said courts, and from all other citizens and tax-payers of said county and city the fact, that the said Roper intended to apply for the lease of said ferries, and their intention to lease the same to him. They also charged the defendants with refusing to consider an offer of lease for a larger amount and upon better security. And, finally, they charge that the defendants did not obtain the consent of the hustings court of Portsmouth and the county court of Norfolk county, and therefore that the lease has not been made in conformity with the law, and must be annulled. To these bills the city of Portsmouth, John L. Roper, and two other of the defendants, filed a demurrer and answers. We think that the demurrer was untenable, and that it was properly abandoned on the argument in this court. In this country the right of property-holders or taxable inhabitants to resort to equity to restrain municipal corporations and their officers, and *quasi* corporations and their officers from transcending their lawful powers or violating their legal duties in any way which will injuriously affect the tax-payers, such as making an unauthorized appropriation of the corporate funds, or an *illegal disposition of the corporate property,* * * * has been affirmed or recognized in numerous cases in many of the states. It is the prevailing doctrine on the subject. 2 Dill. on Mun. Corp'ns (3d ed.), sections 914, 908.

And in *Bull v. Read,* 13 Gratt. 87, this court said, it is allowable, according to settled practice, for some to file a bill on behalf of themselves and others, inhabitants similarly situated, seeking any relief, to which they might all in common be justly entitled, although their individual interests might be several and distinct. High on Injunctions, sections 793–94.

The obvious application of the principle thus announced to such a case, as is made in the bills, at once establishes that the plaintiffs below were proper parties to bring a suit of this

character, and that injunction is the proper remedy in a case of this kind. Now all the material allegations of the bills being, as we conceive, fully sustained by the proofs, it only remains for us to consider whether the act of the appellants in granting this lease was within, and under all the circumstances, a rightful exercise of their powers; or, *ultra vires;* or, as Mr. Justice Blackburn sometimes puts it, *"extra vires."* For if it was *ultra vires,* or a gross abuse of their rightful powers, it was, in either event, void, and the decree of the circuit court must be held to be right. Let us see. A franchise is a special right or privilege conferred on individuals by grant, actual or presumed, from the government, and which otherwise they could not exercise. 2 Washb. Real Prop. 18. The property acquired is not the franchise, but the franchise consists in the incorporeal right. All ferry franchises are in contemplation of law granted for the purpose of promoting the public interests or convenience, and are subject to be changed, if not repealed, as the public interests may demand. *Tuckahoe Canal Co.* v. *Tuckahoe R. R. Co.,* 11 Leigh, 76; *East Hartford* v. *Hartford Bridge Co.,* 10 How. 534; 1 Dill. Mun. Corp'ns, section 114, n. 2.

The right to confer them belongs to the legislature as trustee, not merely for the individuals living within the limits of the particular municipality, but for the public at large. 2 Dill. Mun. Corp'ns, section 658; *Norfolk City* v. *Chamberlayne,* 29 Gratt. 538.

In Green's Brice's Ultra Vires, the author at page 597, in speaking of ferry franchises, says, when a corporation or *quasi* corporate body has been created for the accomplishment or carrying out of public objects; in all such cases the powers possessed by the corporation have been conferred upon it, not for the advantage of itself or its individual members, but for the public weal. Any employment of such powers, save and except for the public purposes, and those special public purposes for the advancement of which they were designed, is *ultra vires.*

The exercise of the ferry franchise in this case was, therefore,

a personal trust which could not be transferred without the consent of the sovereign power. "It may be considered as settled," says Chancellor Zabriskie in *Black* v. *Delaware and Raritan Canal Co.*, 22 N. J. Eq. 399, "that a corporation—and the same may be said of a *quasi* corporate body—cannot lease or alien any franchise necessary to perform its obligations and duties to the state without legislative authority." Dill. on Mun. Corp'ns, (3d ed.), §§ 96, 575, 909, 910 and 912 ; *Thomas* v. *Railroad Co.*, 11 Otto. 72. And in *Minturn* v. *Larue*, 23 How. 436, Mr. Justice Nelson delivering the opinion of the whole court, says it is a well settled rule of construction of grants by the legislature to corporations, whether public or private, that only such powers and rights can be exercised under them as are clearly comprehended within the words of the act, or derived therefrom by necessary implication, regard being had to the objects of the grant. Any ambiguity or doubt arising out of the terms used by the legislature must be resolved in favor of the public. This principle has been so often applied in the construction of corporate powers, that we need not stop to refer to authorities. *Somerville* v. *Wimbish*, 7 Gratt. 229.

In this state ferry franchises have always been granted with a view to subserve the public convenience. As early as the year 1641, in the first act in regard to ferries, the assembly, in the quaint phraseology of that day, enacted that, "for the more ease of travellers all the country provide and maintain fferrys and bridges, and the leavy for payment to the fferrymen to be made by the commissioners where the fferry is kept; and that all passengers, whether strangers or others, should be freed from payment otherwise than by the leavie." Thus stamping them in the most emphatic manner with the impress of a public use or trust. And from that period down to the making of this lease, in all the various acts relating to these particular ferries, it will be found that the legislature regarded and treated them as a public trust, and that it has claimed and exercised its paramount authority both in prescribing the powers and rights pertaining to

said ferries, and in regulating and managing them through its different agents. On the 1st of March, 1858, the town of Portsmouth was carved out of the county of Norfolk, and created into a separate municipality. And on the 25th of March, 1858, the general assembly passed an act "to provide for the disposition of the common property of the county of Norfolk and the city of Portsmouth. By the first section of this act, that city was required to assume one-half of the indebtedness of Norfolk county; and by the third section of said act it was provided that the ferries which now ply by authority of law, between the said city of Portsmouth and the city of Norfolk, and Washington Point, known as the "Norfolk county ferries," shall continue to run as now authorized by law, and shall be the joint and equal property of said county and city. They shall be regulated by a committee of six, three of whom shall be appointed by the court of said county, and three by the council of said city; provided that nothing herein contained shall render null and void or vitiate, any arrangements heretofore made, by which said ferries have been leased or rented out, and the profits of which shall accrue equally to said county and city. At the time of the passage of this act, these ferries had been leased out by the county court of Norfolk in pursuance of law, and it was a knowledge of this fact which made the legislature provide in this section against any action on the part of the committee which might interfere with or impair this subsisting contract. And so it may well be presumed it was from a knowledge of this same fact as well as from a purpose to diminish the indebtedness of that city to the county, that the legislature, by the fourth section of said act, provided that the agent or *lessee* of said ferries should pay the proceeds thereof to the treasurer of Norfolk county. On the 19th of December, 1870, the legislature, by an act of that date, authorized the "joint committee for the regulation of Norfolk county ferries" to borrow on behalf of Norfolk county and the city of Portsmouth, a sum of money not exceeding the sum of $30,000, for the purpose of completing such boats

now in course of construction for the use of said ferries, for the repairs of such boats now in use, and the building of such new boats as may be necessary or expedient to have, and for the repairing and equipping of the wharves, docks and other appurtenances of said ferries; and to pledge by deed of trust or otherwise, as security for said loan, principal and interest, all the net tolls and receipts of said ferries, and all boats, engines, wharves, docks and all other personal and real estate connected with said ferries. And again, by act approved March 26th, 1872, it conferred upon the said joint committee authority to issue on behalf of Norfolk county and the city of Portsmouth, coupon bonds to the amount of $30,000, for funding the debt which had been theretofore created by them, and required that said bonds should be signed by the chairman of said joint committee. Acts 1871–72, page 449. And on the 26th of February, 1876, an act was passed, which, in terms, repealed all acts and parts of acts in conflict with itself. Section one of this act provides that the ferries shall continue to run, as now authorized by law, and shall be the joint and equal property of said city of Portsmouth and Norfolk county. Section two provides that said ferries shall be regulated and managed by a committee of six, three of whom shall be appointed by the judge of the county court of Norfolk county and three by the judge of the court of hustings for the said city of Portsmouth. And section three makes it the duty of the agent or lessee of said ferries to pay the net proceeds or profits thereof, from time to time; one-half to the treasurer of Norfolk county, who shall be responsible for their disbursement as may be ordered by the board of supervisors of said county, and the other half thereof to the treasurer of the city of Portsmouth, who shall be responsible for their disbursement as may be ordered by the council of said city. Now, under the statutes and the general laws of this state applicable to the boards of supervisors of counties, the appellants claim the power (which they have undertaken to exercise) to make the lease to John L. Roper. Can

this claim be sustained? After a careful examination of all these statutes, we have no hesitation in declaring that it cannot.

The appellants, whilst they admit that the power to lease these ferries is nowhere given to them in express terms, nevertheless insist that it is impliedly given to them in one of the following ways, viz. :

1. As an incident to their ownership of these ferries.

2. By the fourth section of the act of March, 1858, taken in connection with the ninth section of the same act, and by the third section of the act of February 26, 1876.

3. That it is conferred in the general statutes which define the powers and duties of the boards of supervisors in the various counties of the state, or came to them by some unknown powers of devolution *as successors* of the county court.

Now, as to the first suggestion. As has been heretofore shown, this property came into the hands of the joint owners as a public trust, and to such ownership the *jus disponendi* is not an incident. Mr. Dillon, an author of deservedly high rank, says at section 575 of his book on Municipal Corporations, "they cannot, of course, dispose of property of a public nature, in violation of the trusts upon which it is held, nor of public squares, streets or commons." These ferries were public highways. The property in them was conferred upon the appellants to be used for the public benefit, and it was not possible for the appellants to dispose of them, by lease or otherwise, without express legislative sanction. 1 Dill. Mun. Corp'ns, § 96. 2d. Nor can the power to lease these ferries be deduced from either the fourth section of the act of March, 1858, nor the third section of the act of February, 1876. These ferries had been repeatedly run by agents and lessees, and at the time of the passage of both of those acts were actually under lease. Under such circumstances the mere fact that the legislature made it the duty of *such agents* or *lessee* to pay over the net proceeds can give no countenance to the contention on the part of the appellants that they were

thereby empowered to lease these ferries, especially when the effect of such a construction will be, as they admit, to strip this joint committee of the power "to regulate and manage their ferries" with which the legislature has clothed them.

Nor is the third position assumed by the appellants any better sustained; for the board of supervisors, like every other *quasi* corporate body, being the mere creature of the statute, it has only such powers as are expressly conferred upon it, or necessarily implied in furtherance of the object of its creation.

These boards are created for the purpose of managing the ordinary county affairs appertaining to all the counties of the state alike.

And by no fair implication can the power to lease this ferry be included within the grants of power to them. But this is not all. The power to regulate and manage these ferries has been conferred upon the joint committee by special statutes, and the general statutes, creating boards of supervisors, cannot upon the familiar rule of law—that statutes, of a general nature, do not repeal by implication special acts framed for particular municipalities—be held to repeal and take away from the joint committee, as it admittedly would, if the views of the appellants were sound, the power to regulate and manage these ferries.

Nor is there anything in the intimation that the supervisors of Norfolk county acquired the power to lease these ferries from the county court of Norfolk, where it certainly resided formerly. The boards of supervisors take nothing upon the assumption that they are the next in succession to the county court. Many of the powers which they have may have been formerly vested in the county court as an agency of the state; but these powers do not come to the supervisors by devolution. Then these powers have simply been taken away from the county court, one agent of the state, and have been conferred upon another agent of the state, viz: the board of supervisors.

From this brief review of the acts of assembly, relating to these ferries, it sufficiently appears that none of the grounds

upon which the appellants found their claim of right to lease these ferries are tenable, and that, as a consequence, the council of the city of Portsmouth, and the supervisors of Norfolk county, in granting the lease on the 13th of December, 1881, to John L. Roper, acted *ultra vires,* and the lease is null and void. But if it should be conceded, *argumenti gratia,* that the power to execute this lease was in the grantors, the city of Portsmouth and the supervisors of Norfolk county, we still think that the facts and circumstances attending the execution of said lease were of such a character as to justify the court below in setting it aside, and declaring it null and void. For these reasons we are of opinion that there is no error in the decree appealed from, and that the same must be affirmed.

DECREE AFFIRMED.