# CHARLESTON.

## FOLEY v. COUNTY COURT.

Submitted June 15, 1903—Decided November 7, 1903.

1. STREETS AND ROADS—*Adverse Possession.*
    Where private property is being taken for public use without compensation, equity has jurisdiction to enjoin the act, though there be controversy as to the title or boundary of the land, and to pass on the right of the parties finally. (p. 28).

2. STREETS AND ROADS—*Abandonment.*
    No title by adverse possession can be acquired of land owned by a county and used for a public use for the site of a courthouse and other public buildings. (p. 28).

Appeal from the Circuit Court, Doddridge County.

Action by Tabitha J. Foley against the County Court of Doddridge County. Judgement for defendant and plaintiff appeals.

*Affirmed.*

J. V. BLAIR, for appellants.

M. R. CRAUSE, W. S. STEWART and CARTER & DUPUY, for appellees.

Brannon, Judge:

Nathan Davis was the owner of a tract of land on which stands the town of West Union, the county seat of Doddridge County. Davis by deed dated 15th May, 1845, conveyed to the county court a lot or parcel of one acre out of this tract "for the purpose of erecting theron the necessary public buildings for the use of the said county." Afterwards he laid out the town into streets and lots, and made a plat or diagram of the town numbering the lots, showing the lot so conveyed to the county and the relative position of it and the streets and lots as to each other, which plat was recorded in the office of the county clerk. After making the deed to the county Davis conveyed to individuals four lots between the Northwestern turnpike, called Pike street, later Main street, and South street, later Court street, said lots on said plat being numbered 3, 4, 15 and 16, forming a block, 3 and 14, adjoining said court house lot or square on its west side, the conveyance of these lots called for said square in their description or boundary. These four lots by *mesne* conveyances came to be the property of James A. Foley, lot 3 by deed dated 6th November, 1848, and the others by deed dated 29th December, 1851. Foley died in 1871. His will devised these lots to his widow, Tabitha J. B. Foley, for her life, with power of disposal, and remainder to his children, thus giving her, at least, an estate for her life. Foley took actual possession of these lots at once upon his acquisition of them, and the county took actual possession of its lots at once upon its acquisition by the erection and maintenance of a court house upon it. A strip of ground 21 feet, 4 inches wide on Main street, and 15 feet on South street is in controversy between the county and Foleys, the county claiming that its deed includes it, the Foleys denying this, and claiming its ownership. The question is one of boundary. In 1899 the county by its contractors began the excavation upon its lot of a foundation for a new court house, and deposited a large quantity of earth upon this disputed strip of ground, which was included in part by an old fence built by Foleys, and occupied by a coal house, trees and shrubbery placed there by them; but the strip was virtually in common from absence of fence in part, and was largely taken up with briers and weeds and wild or neglected growth. Mrs. Foley filed her bill in equity setting up her title to said lots

and the acts of the county court in such invasion of said strip, and alleging that said county designed to apply said strip for public purposes without having the same condemned according to law. An injunction was awarded against the county court restraining it from further acts upon said strip of ground. The county court demurred to the bill, but its demurrer was over-ruled. It then filed an answer setting up its deed from Davis for said court house square, claiming that it covered the strip of land in issue, and gave title to the county, and that it had right to deposit earth upon the strip, and to take possession of it for public use, and admitted that it had taken such possession and was fitting the strip for public use by filling a drain thereon and grading the land, and denying any right in the Foleys to it. Depositions covering hundreds of pages of the printed record were taken, and upon the hearing the court made a decree of absolute dismissal of the bill and dissolution of the injunction, and from this decree Mrs. Foley appealed.

The first question we meet is whether equity has jurisdiction. The defence would justify the decree by the argument that the acts of the county are nothing but mere trespass, doing no irreparable damage, and that remedy adequate could be had by action at law, on principles stated in *Becker* v. *McGraw*, 48 W. Va. 539, and several prior cases. It does seem that the injury is of such character as to be compensated by action at law, so far as the nature of the acts of the county goes; but do the rules given in those cases answer in this cause? This not a mere trespass, transient and passing, slightly affecting the freehold, because the bill alleges and the answer admits that the county was taking the strip of land for permanent public use without compensation, forever wresting the land from the plaintiff, if her property, and it is settled that where a town or county is taking property for public use, without compensation, not merely injuring it, there is no legal remedy answering the emergency, and injunction lies. *Boughner* v. *Clarksburg,* 15 W. Va. 394; *Yates* v. *West Grafton,* 23 *Id.* 507; *Mason City S. & M. Co.* v. *Mason City,* 23 *Id.* 211; *Ward* v. *Ohio R. R. Co.,* 35 W. Va. 181; *Spencer* v. *Railroad,* 23 *Id.* 406. In the case of takin land for public use without compensation no averment of irreparable injury is necessary, the very "taking" being such. Hill on Injunc. 588; *Western* v. *Owing,* 15 Md. 199. Where the

right of the plaintiff to the land is clear, and the power taking it
has no title to it, the cases say that as the constitution imperative-
ly demands prepayment or security of compensation the injunc-
tion will restrain until compensation be paid or secured.  But in
this case there is controversy as to boundary, and consequently
title is in dispute.  Whilst injunction lies, it is only temporary
until title or boundary shall be settled by recourse to law action,
or will equity having jurisdiction under the cases just cited for
one purpose, go on to decide upon the question of boundary
and title, and finally adjudge the right?  The case of *Freer* v.
*Davis,* 43 S. E. 164, 52 W. Va. 1, was a case where titles to
land were hostile, and under one of them oil operations were
going on for the taking of oil, and jurisdiction for injunction
was sustained; but as the matter involved was one of title, it
was held that the injunction should be temporary, only until
the conflict of title should be settled by action in the law forum,
and then dissolved or perpetuated, according to the decision at
law.  The question will be found discussed in the two opinions
in that case.  Where there is no question as to title or boundary,
or the matter is clear, the equity court gives full decision in case
of irreparable damage, as conceded in that case by all the mem-
bers of the Court; but where title or boundary is fairly in
issue, the majority held that under the general rule that equity
will not try contested title or boundary, unless there be jurisdic-
tion under some known head, independent of title or boundary,
the injunction should be entertained only until legal adjudica-
tion, and equity could not decide title or boundary, as the con-
stitution gives a claimant to land trial by jury.  This doctrine
presents the objection that the arm of equity falls limp as soon
as a controversy of boundary or title crops out in the case, and
further litigation in another suit is necessitated.  But much
authority sustains it.  In that excellent equity work, Am. & Eng.
Dec. in Eq., in vol. 8, p. 524, is an elaborate review of this
question sustaining jurisdiction for at least temporary injunc-
tion.  See page 430.  I expressed no final opinion in the Freer
case upon this question, nor do I in this case.  In that case I
did not, and in this case do not, find it requisite to do so, be-
cause I contended in it, as I do in this case, that when a party
chooses the equity court, and submits his whole case to it, he
cannot, in case of defeat, raise the question of jurisdiction.

Mrs. Foley chose her court in this case. If a decree made without jurisdiction because the law forum is the proper one were absolutely void, it might be different; then the court, without being asked, might treat it as not binding anybody; but such decree is not void, but merely erroneous upon complaint by appeal. *St. Lawrence Co.* v. *Holt,* 51 W. Va. 352. I cite *Buskirk* v. *King,* 72 Fed. R. 22, sustaining temporary injunction during contest of title. I cite *Erhart* v. *Boaro,* 113 U. S. 537, for the language: "It is now a common practice in cases .where irremediable mischief is threatened or being done, going to the destruction of the substance of the estate, such as extracting of ores from a mine or the cutting of timber, or the removal of coal, to issue an injunction, though the title be in litigation." See 8 Am. & Eng. Dec. in Eq. 431. And in *Haskell* v. *Sutton,* (44 S. E. 533), 53 W. Va. 206, this Court upheld the jurisdiction for at least temporary injunction. In *Camp* v. *Dixon,* 112 Ga. 872, (38 S. E. 78), 8 Am. & Eng. Dec. in Eq. 421, the jurisdiction to fully decree on adverse titles seems to be asserted fully. Where equity once lawfully takes jurisdiction by injunction against trespass working irreparable damage, as extracting oil or taking land for public use without pay, and question of title or boundary arises, I do not say whether or not equity can decree the whole case, without recourse to law. Under *Freer* v. *Davis* it cannot do so. I do not say whether or not a party who has objected to jurisdiction can, in case of decree against him, reverse for that cause. I only say that one who has chosen the equity court, and thus waived a jury, ought not to be permitted to do so; but *Freer* v. *Davis* holds that he is not estopped. In the cases where this Court has entertained appeals from decrees in injunction cases against taking land for public use the court seems to have considered all questions, though the question whether the court should decide all questions wthout recourse to common law not pointedly considered in them. Those cases, however, show that the jurisdiction was not questioned. In the present case the plaintiff not only selected the chancery court and submitted her rights to it, but in this Court she asked the court "to take the case for all purposes, settle the disputed line and enter such decree as should have been entered by the lower court."

But without regard to the fact that the plaintiff elected to go

into equity, the whole court thinks that as the constitution prohibits the taking of private property for public use without compensation, equity has jurisdiction in this case to pass upon the merits in full.

The question involved is the location of the line dividing the court house square from the Foley lots 3 and 14. When we once locate the lines of the court house lot or square, this question of the case is ended, because the deed from Davis to the county is first in date, and, besides, the conveyances by which Foley's claim for this court house lot, and thus limit the Foley lots by it. The Foleys have no title to invade the county property. I cannot detail the several hundred printed pages of evidence on this boundary question.. Even the reference to it here made is unnecessary, and even improper, as it can be of no use for purposes of precedent, but it is made to indicate reasons why we find the boundary controversy in favor of the county, when in fact we need not, ought not, do even this, but simply find the result of the evidence. The evidence shows certain salient facts which plainly lead to the conclusion that the strip in issue is within the boundary of the court house lot. The north side line of the county court house square is Main street, once called Pike street; its south side line is South street, once Court street. On its east side it joins lot number 2; and on its west side two Foley lots 3 and 14. The deed of Davis to the county gives the boundary of the court house lot thus: "Beginning at a point near the spring drain, on the west side of the said drain, and the Northwestern Turnpike road, and running S. 32 W. 13 poles to a stake; thence S. 58, E. 12 poles to a stake; thence N. 32 E. 13 poles to a stake: thence N. 58 W. 12 poles to the beginning." As shown by the original plat of West Union made by Davis and recorded, this court house square is bounded on its north side by Main street and an alley, and on its south side by South or Court street, on its east by lot No. 2 on said plat, and on its west side by the Foley lots 3 and 14. Where shall we place the beginning corner of the court house lot? We do not put it just at or in the drain that ran from the public spring in court house lot, as Foley seems to have thought he had right to do, because the county deed says the square begins "near" the drain, on its west side. This word "near" is indefinite, does not give exact point. But look at

that plat made by Davis laying down the court house square, and the lots of the town by number and the streets, and we find north of Main street an alley running from the north to Main street passing lots 1 and 10, and stopping at the court house lot, and then resuming its course south from South street, passing lots 17 and 4. And we see on this plat that the line of these lots is marked clear through the town, running past lots 1 and 10 north of Main street, crossing Main street, and passing between the court house square and the Foley lots 3 and 14, and then crossing South street, and then passing on the west side of said alley along lots 17 and 14. Why shall we not adopt this line? Approach court square from the north or south by this line and we find it continuing along the court house lot dividing it from the Foley lots. That plat, the original one of the town, dictates the location of the dividing line between the court house square and the Foley lots. After fifty years, after the fathers of the town sleep, that plat lives and points for us the unerring finger of index. Nobody says that this line is not the line of lots 1 and 10 north of Main street, and of lots 4 and 17 south of South street, and the plat shows that the Foley lots between those streets, have a common east line with the lots north and south of them. We cannot escape from the line so plainly shown by this plat. That plat says we must put the beginning corner of the court house lot just at the point where that line leaves Main street on the south side of Main street. It never was the intent of Davis to make these Foley lots just a wide space farther east than neighboring lots across Main and South streets from them. It would produce irregularity and defeat the plan of the town, as shown by the old plat. The plat denies this claim. This alone settles where the dividing line is and ends the controversy; but it is by no means all that goes to the same result. Away back in years, shortly after Davis conveyed to the county the court house lot, and shortly after he conveyed the Foley lots, when the first settlers of West Union were living, and Davis living, a store house was built by Foley himself on Foley's lot 3 on South street just at the corner of court house square. It is now the Foley residence. It is fair to presume that when the lines were well known it was the intent to place this house just at the line of the court house square. There it is to-day. But it is not a

mere presumption; for Hickman says that he well knew of the building of this store house by Foley, and that his purpose was to put it just at the line of the court house lot, and was careful to do so. Other witnesses say so. Hickman had peculiar means to know this, because he was clerk of the courts in the forties, right on the court house ground, and a friend and in daily intercourse with Foley, as is attested by Foley's will directing his wife as executrix to follow Hickman's advice. Here, then, we have the action of Foley, the owner of lot 3, certifying that this old plat line, now claimed by the county court, was the true line. To confirm the position that this line is the true one upon it a fence was built many years ago joining the house and running thence to Main street, at the point where stands a stone very lately planted by the county as the point claimed by it as the beginning corner of the court house lot. This fence is gone, but traces of it remain. Just inside this fence, from two to three feet, Foley himself planted a line of apple trees many years ago. He built or recognized that fence. The line of apple trees was set by him because he recognized that fence as the line. This fence, these apple trees were set soon after Davis conveyed the Foley lots. They tell in strong voice where that line was. Those trees stand to-day on the line above spoken of, living monuments to prove the true division line. They stand two or three feet from a line run from that house to that stone on Main street. One of them stands nearly at that stone claimed by the county as such beginning corner. Now, if Foley, when the matter was new, thought that the true line was $10\frac{1}{2}$ feet east of that house on South street, as claimed by Foleys' at one time, or $15\frac{1}{2}$ feet as claimed by them later, and 21 feet east of the stone on Main street, as claimed by them at one time, or $16\frac{1}{2}$ feet as claimed by them later, why did he not put that fence on that different line, and set his trees there? Because he did not then think the line was there. He did not then so understand the deed. Here a legal principle has telling force. "If the language used in the descriptive clause is uncertain and doubtful, the practical construction given to the deed by the subsequent acts of the parties may be shown by parol evidence." 2 Devlin on Deeds chapter 1042. Their acts speak their construction. *Caperton* v. *Caperton,* 36 W. Va. 479. That this house does abut on the court house lot is shown by further

evidence. The evidence of J. N. Wolverton, county surveyor, shows that he went to a point on South street to a nail or peg placed for a corner at the Union Bank, placed there by an old county surveyor for a proper corner of a lot on Columbia street, and making proper allowances for that street's width ran along South street along the Foley lots to the corner of said house next the court house lot, and found the distance of the Foley property on South street 198 feet, just as called for in their deeds. But they would go on ten or fifteen feet further and cut down by that length the line of the court house lot, though it was first conveyed, and the Foley grant was limited by it. And this house is just on that line running across the town above spoken of as shown by the old plat. And treating the house as on the line, the Foley lots have the same distance along South street as the lots on the other side of the street, the Maulsby and Neely lots, harmonize with them; whereas the claim of Foleys would give them 19½ or 14 feet more length than those lots, when they should be the same. That house ends on the line, and a line from it by the county's deed, S. 32 W. 214½ feet, conveys us to Main street at the stone claimed as the beginning corner of the county lot by the county court. We must add an important item of evidence to corroborate this. Who should know the line, the beginning corner, better than Davis, the county grantor? He showed Hickman this controverted line in 1845 or 1846, and the corner of the court house lot on Main street was at or near where stands the stone claimed as the true corner by the county.

But let us seek this beginning corner and this line of division from another direction. There is a point admitted by both sides to be the northeast corner of the court house lot. It was established as such corner by a verdict in an ejectment between Knight and Charter. Though this finding is not evidence in this case competent, yet it is conceded that it is such corner, and that from it there ran an old fence to South street near the old jail, at a rock planted many years ago by Sherwood between lot No. 2 on the old town plat and the court house lot; and that this is the true eastern line of that lot—the opposite end of the lot from the division line litigated in this case. Now run from the said point or corner on the alley, the northeast corner of court house lot, along the line of lot No. 2 along the

fence to the old jail and then with it to the stone planted years ago by Sherwood for the corner of lot No. 2 and the court house lot, by the course and distance of the county deed, and it brings us to that stone on South street at the corner of the old jail. Then run from this corner along South street the course and distance called for by the county deed, and the line ends on the corner strip of the said store house erected by Foley. This fully corroborates the much other evidence to sustain the position that said house has its end on the true division line between the court house lot and the Foley lots. Thus we have three established corners, and from them we can inevitably locate the fourth. That fourth corner must mathematically be found at the intersection of two lines. Run one from the store house by the call of the county deed, and it ends at the stone on Main street claimed by the county as its beginning corner; run the other from said northwestern corner to the court house lot, the Knight-Charter corner, along the alley and Main street, by the course of the county deed, and it ends at that stone. The evidence shows that Foley in his life moved that old fence, or rather built new ones, each time further east on the public property. He told an intimate friend that he would do so; that his line was on Main street where the drain emerged; and he made an excavation for an ice house, and dumped the earth into the drain, ravine or hollow, and pushed the drain further east, and intended to get further over on the court house property. He told his friend that he intended to fence in the spring when he again removed the fence. He knew where the true line was. Suppose we run the lines according to the Foley claims. We dislocate streets and lots by disarrangement and denial of the town plat, a strong argument against the Foley claim. It would change the shape of the end of the Foley lots following the county deed. The present Foley fence, which has gone to decay, practically leaving their lots to common, is ten feet and two inches east of the house on South street. A point on the opposite of the lot, that is, on Main street, 21 feet and 4 inches from the stone set by the county, is the point first claimed by Foleys as the corner of the court house lot and their lots. The fence ran to it. You cannot run a line between these points along the fence and follow the course of the deed. The deed call is 32 degrees, this line call

38 degrees. Say that the point 21 feet, 4 inches from the planted stone is the beginning call on Main street, and say that the said house is a corner on South street. A line run between these corners varies from the deed, and after passing the house and crossing South street would not follow the alley shown on the plat, now Church street, but would invade lot 17 on the south side of South street, and run diagonally through it. Then run a line from said point on Main street along the Foley fence, and it will not follow or touch Church street, but will cross South street and invade a lot on the east side of Church street (old alley), lot 16 on the old plat, and on the north of Main street run through O'Learry's building. But the Foley claim for the point on Main street seems to change from the distance twenty-one feet and four inches from the stone to a point sixteen and one-half feet from the stone, and from a distance of ten feet, two inches east of the house on South street to one 15 feet east of the house. This line would cross South street and invade still more lot 16, and violate the town plan as shown on the original plat. These considerations, and other more tedious ones might be added, show that the claim of the Foleys antagonizes the plat forming the town, cuts down the court house lot, the first grant, and adds to the Foley lots and disagrees with the true relative location of many neighboring lots as presented by said plat. The line from the corner of the Foley residence on South street to the stone on Main street must be held to be the true division line between the court house lot and the Foley lots.

Another question. Mrs. Foley claims that be the line where it may, she has good right to the strip by adverse possession under the statute of limitations. This question is tested by the question whether one can by encroachment upon a public street get title against the public by adverse possession. Both a street and a court house lot are held in trust for public use and no other purpose whatever by town and county court. They are not in such cases private property owners. The county court has legal title, it is true, but solely for governmental purpose. As to streets this Court has held that no one can by possession get title against the public right. *Ralston* v. *Weston,* 46 W. V. 544; *Weston* v. *Ralston,* 48 *Id.* 170; *McClellan* v. *Weston,* 49 *Id.* 669. The town does not own the streets,

nor do the people of a town, "but the public at large." In *Norfolk* v. *Chamberlain,* 29 Grat. 534, one reason for this position is based on a general rule, hoary with age, founded on public policy and necessity, that the obstruction of a public way is a public indictable nuisance, and that no lapse of time will ligitimate it. Encroachment upon court house ground is a public nuisance, because it affects the public, which has a right to its unrestricted use. 21 Am. & Eng. Ency. L. (2 Ed.) 683; *Commonwealth* v. *Eckart,* 2 Browne, (Pa.), 249. Such public nuisance prevents the public use, and where even the property, the very title, is vested in the state, county or municipality, such wrong prevents the state, county or municipality from freely using the property to accomplish the only purpose of its ownership, that is, its application for governmental purposes in its public use. If such were not the law, then the governing power would lose property essential for government purposes, because of the inattention of officials or their ignorance of hostile possession. But it is said by some that this rule is changed in this state from the fact that section 20, chapter 35, of the Code says that "Every statute of limitations, unless otherwise expressly provided, shall apply to the state." The books say that the statute runs as to property held by the government merely as owner, in private ownership; but not as to that held for purposes of government in its actual use. Elliott, Roads and S: 2 ed. sections 136, 882. That exception applies even where the statute runs against the state for if there were no statute making limitation apply to the state, there would be no need of such exception. The well considered Georgia case of *Norrel* v. *Augusta Railway Company,* (1902) 59 L. R. A. 101, meets this objection pointedly as do other authorities, holding that even where there is a statute making adverse possession apply to the state, the statute is to be construed as intended to apply only to such property as is held by the state like an individual proprietor, and operate only on its property interest, and as not intended to apply to property held by the state for purely governmental purposes. The court said, "Prescription does not run against a municipal corporation in regard to land held for the benefit of the public." This a fair construction of such a statute, and is only an instance of the rule often applied in the construction of statutes, that is, that we must not too

closely and literally follow the letter, but must follow the spirit; for statutes have a spirit and intent as well as a letter. Shall we always make a statute do what we are sure will work a result not intended by the legislature, simply because to do so would be justified by its letter when we know there are other instances where conformity to its letter will attain the real purpose, as if we give this statute application against the state as to its demands for money and property rights vested in it as if a private owner and not held in trust for actual use in the exercise of governmental functions? Let us illustrate. West Virginia owns thousands of acres of wild land forfeited for taxes. This property is not itself used in the exercise of government. Its proceeds only are so used, but not the very land. If one claiming title seat himself upon this land, he gets a good title from the lapse of time, because the statute cited makes limitation run against the state in such a case. As state officers cannot possibly watch lands in all sections of the state, we may well doubt the wisdom of the statute giving benefit of limitation to the occupant in such case, and thus causing the state to lose its property; but the Legislature has seen proper to do so; but can we say that it intended to deprive the state of property which in its very self is held for government purposes and essential to enable the public authorities to carry on government? We cannot think so. Suppose one should hold for ten years the state capitol, or an annex, or subsidary building, or a part of the capitol ground, or any ground or property used in actual government; could we think the Legislature intended the state to lose it by adverse possession? Suppose the state owned a turnpike; can we think the Legislature designed by the act in question to lose to the state that turnpike by adverse possession? Reason, necessity, the public welfare and legal authorities deny such result. But if you contest this position and say that the letter of the act covers all property, and every right of the state, then we take you at your word and fall back on the very letter of the statute and say that it applies only to "the state." A county or town is not the state. The state does not own a court house lot or street or road; indeed, I go further and say that as to a highway neither the county nor town owns it; nobody owns it; only that non-corporate, indefinable "public" owns it, if ownership any where there is. *Hoadley* v. *City,*

50 Cal. 265; opinion in *Norfolk* v. *Chamberlain,* 29 Grat. 534. Where is the statute of limitations in letter applying to that right? The statute of limitations supposes a right in one party to be made good by time, and a right in another to be defeated by time. Who has the right in a highway to be defeated by time? There is no legal entity to which the statute can apply no person against whom it can run, no individual right. This is illustrated by the late Nebraska case of *Kruger* v. *Jenkins,* 59 Neb. 641. Former cases in that state held that adverse possession would defeat the public right in a street; but this case involved a highway in the county, and the court said that those earlier cases were based on the statute which gave the town actual title to a street, and enabled it to sell it and devote its proceeds to any use, whereas in a case of a county road, that statute did not apply and that no time would bar the public right in such road. The court said: "The right involved in this litigation is one belonging exclusively to the public at large. Neither Douglass County nor its citizens have any peculiar interest in it. A county does not hold legal title to county roads; it has no power of disposition over them, no propriatary interest in them. In performing duties with which it is charged in connection with them, it is an agent of the state and in the interests of general public. Title to part of a county road cannot be acquired by adverse possession." In West Virginia the adjoining owner owns the soil of a street or road; the county or towns own nothing; the public has right of passage, and the county or town simply has control and management for the public use. There is no property in it—no person owning such property as that limitation can run against him in the absence of a statute plainly making the public right subjejct to limitation. The Georgia case of *Norrell* v. *Augusta Railroad Company,* 59 L. R. A. 101, says that as the city has no power to grant away a street, it cannot lose it by inaction, citing *Augusta* v. *Burum,* 26 L. R. A. 340, 19 S. E. 820, holding that no time gives right to continue an awning over a street, though the statute runs against the state. The court in the latter case said that we must attribute the presence of the awning to a mere revocable license express or implied; that "the public are the rulers—the source of all power—and it cannot be sound doctrine that their servant in any law making department can, by lapse

of time, be deprived of powers the exercise of which are essential or necessary to the proper performance of their duties and obligations to the public." A later Georgia case decided August 14, 1903, reports this holding. *Langley* v. *City,* 45 S. E. 486.

It is sound law that municipal coropartion cannot by express act give up or sell a part or all of a street without statute authority. *Roper* v. *McWhorter,* 77 Va. 214; *Mayor* v. *Ray,* 19 Wall. 468; *Jordan* v. *Chenoa,* 166 Ill. 536. It is therefore going far to say that by mere negligence a town can deprive the public of an essential right of passage over its street. It is unreasonable that a court should, before holding the statute of limitation applicable to work so dire a result to the public as the loss of a great right of highway, demand a statute from the Legislature plainly requiring it to so hold. The public right is the highest in this land. It is to be preferred to mere individual right. It would be disastrous to the public wellfare to allow the public highways to be lost by private encroachment, until the Legislature shall so command. We can not recede from the position three times taken by this Court in the three cases above cited.

Since those cases were decided there have been subsequent review and declarations of the law upon this subject. The Georgia case decided in 1902 has been above stated. In a late note in 87 Am. St. R. 775, this subject has been reviewed upon many authorities and the statement made that sound law and the great conclusive weight of authority show that the public cannot thus lose its right in a street. Language used by Judge Dent in the opinion in *Ralston* v. *Weston,* 46 W. Va. 544, is extensively quoted in that note and is pronounced as reflecting sound law. All the great text books substantially so state the law, especially the late ones. That late and most valuable work on municipal corporations, Smith on Municipal Corporations, section 1092, says:

"From some loose dicta both in this country and in England it has been supposed that a right to maintain a public nuisance may be acquired by prescription, but no such right should exist in reason, and the great weight of authority is against it. There can be no sound rule of law that will protect any man in thus depriving others of the substantial use and enjoyment of their property." In section 1511 we read: "And so a part of a road

which is not used or traveled for six years, and becomes impassable for vehicles, ceases as to such part to be a highway, and the village or city is not liable for injuries thereon received, (under a statute). But this non-user by the public must be distinguished from such an occupation by a tresspasser of a part of a highway as amounts to an obstruction or nuisance; and he cannot acquire a prescriptive right to the highway by a continued occupation of twenty years." See Tiedman on Munic. Corp., section 312; 1 Hogg's Eq. Proced. section 370; 1 Cyc. 1117; 1 Am. & Eng. Ency. L. (2 Ed.) 878; Elliott, Roads & S. section 883; also late cases of *Raht* v. *Southern Railway Co.,* (Tenn.), 50 S. W. 72; *Board* v. *H. Weston Lumber Co.,* 33 So. (La.) 923; note to *Schneider* v. *Hutchinson,* 76 Am. St. R. 474, 488; *North. Pacific Ry Co.* v. *Ely,* 87 Am. St. R. 766, 775, opinion of Justice Field in *Grogan* v. *Town of Hayward,* 4 Fed. 161; *Simplot* v. *Chicago. etc., Ry. Co.,* 16 Fed. 350; *London & San Francisco Bank* v. *Oakland,* 90 Fed. 691, 702.

If the idea of abandonment be suggested, I would say, as stated in the case of *Town of Weston* v. *Ralston*, 48 W. Va. p. 182, that I cannot conceive how abandoment by a town of its street by mere non-user can be asserted, because, as shown by authorities there cited, there must be, not only a mere non-user, but also express intention to abandon. How can we say a town or county court, mere corporations acting by officers, can be held to abandon a street or a court house lot? It is well settled that even a private owner cannot be held to have abandoned his property without both act of non-user and intent to abandon. *Lowther Oil Co.* v. *Miller-Sibley Oil Co.,* (44 S. E. 433), 53 W. Va. 501; *Hast* v. *Railroad Co.,* 52 W. Va. 396. Mere silence of a town council could not be considered an abandonment of a street. It would surely require express order of vacation. *Shirk* v. *City,* 195 Ill.; *Dekalb* v. *Luney,* 193 Ill. 185.

How otherwise could it be proven that a town intended to abandon a street? How can we say that a county court intended to abandon part of the court square without an order of the court? That the public right cannot be lost on the idea of mere abandonment, see further *Dekalb* v. *Luney,* 193 Ill. 185; *Shirk* v. *City,* 195 Ill. 298; *Taylor* v. *Pearce,* 179 Ill. 145; *Chafee* v. *City of Aiken,* (S. C.), 35 S. E. 800; *Crocker* v.

*Collins,* 37 S. C. 327; *Reilly* v. *City of Racine,* 51 Wis. 526; Eliott, (1 ed.) Roads and S. 660.

There is another argument against adverse possession applying to streets and public squares by mere encroachment upon their bounds, and that is, that it wants that essential element to apply limitation, namely, that the possession must be either under color or claim of title *with intent to claim.* Where one holds under color of title occupation is *prima facie* proof of claim of title and intention to claim. *Ketchum* v. *Spurlock,* 34 W. Va. 597. Where, however, there is no color of title, it must distinctly appear that the encroachment by occupation was *with intent to claim* the property as his own. The claimant must make this affirmatively appear. *Hudson* v. *Putney,* 14 W. Va. 561; *Clark* v. *McClure,* 10 Grat. 305. As suggested by the Georgia court in *Augusta* v. *Burum,* 93 Ga. 68, 19 S. E. 820, 26 L. R. A. 340, such possession would be presumed to be under license, a tacit license. Where one fences a whole street we may infer intent to claim; but where he fences only a part, makes a partial encroachment on a street or court house lot, with out paper color of title, should we not infer a tacit license, in order to save the public right? At least, should we not demand of the encroacher affirmative evidence of actual *intent to claim* the property as his own? Otherwise the possession is not adverse. For these reasons we affirm the decree dismissing the bill.

*Affirmed.*