J. A. MACE *et al. v.* GUYAN COLLIERIES CORPORATION *et al.*

(No. 7112)

Submitted February 9, 1932.    Decided February 16, 1932.

*Robert D. Bailey,* and *Wade H. Bronson,* for appellants.
*Goodykoontz & Slaven* and *Lafe B. Chafin,* and *Rolla D. Campbell,* for appellees.

LIVELY, JUDGE:

In 1905 Adolph D. Spratt and his adult children deeded to C. W. Campbell a one-half undivided interest in a tract of land described by metes and bounds, bordering on Guyan River in Mingo County, lying between the river and right of way of Deepwater Railway, containing 9-1/8 acres, a part of his home farm; and later in 1907 the other half was con-

veyed to C. W. Campbell by him as guardian of his minor children by virtue of a decree of the circuit court of that county, by the same metes and bounds and containing 9-⅛ "acres more or less." By subsequent conveyances Guyan Collieries Company and J. L. Caldwell obtained undivided interests in the land with Campbell.

This suit, brought by the heirs and others interested in the home farm of Adolph D. Spratt against the present owners of the tract deeded to Campbell by metes and bounds, is for the purpose of locating on the ground the closing boundary lines claimed to be determinable only by the quantity of land conveyed in the two deeds. The decree located the boundary line by the calls in the deeds and not by the acreage, as claimed by defendants, and plaintiffs appealed.

It appears that Adolph D. Spratt and his children in 1908 owned and lived on a farm on the north side of Guyan River above the mouth of Gilbert Creek, which farm included bottom land in a bend of the river opposite the mouth of Med Branch which flows into Guyan. In the early part of that year Deepwater Railway Company, predecessor in title to Virginian Railway Company, surveyed and staked out a line of railroad through these bottom lands, filed and recorded in the county clerk's office a map, showing the location, and resolution of its board of directors adopting same. The survey of the location followed the river until it reached the bottom land in the bend, and then took a short cut through the bottom leaving the bank at the south end and coming back to the river at the north end, leaving a strip of the bottom between the surveyed right of way and the river. One of the boundary lines of this strip is in controversy. Prior to that time, C. W. Campbell and business associates began purchasing mineral lands on the south side of the river opposite from the Spratt farm, in anticipation of the coming railroad, and in October, 1905, had acquired several thousand acres of mineral on that side of the river. They desired to purchase the strip of bottom land from Spratt for the purpose of locating a tipple and mining camp thereon in connection with their contemplated mines on the opposite side of the river; and on October 19, 1905, Adolph Spratt by written

contract agreed to sell to Campbell a parcel of his *bottom* land opposite the mouth of Lick Branch describing it as ''Beginning at a point where the Deepwater right of way intersects the orchard fence, thence down the orchard fence running at right angles with the Guyandotte River to Guyandotte River. Thence up the Guyandotte River with the meanders thereof to the point where the Deepwater Railway right of way leaves the river to enter the said enclosed bottom; thence down the lines of said right of way to the place of beginning.'' The agreed purchase price was $100 per acre, and the land estimated to contain 10 acres, more or less. Spratt was to have the land surveyed, the quantity ascertained, and deeds made from the adult owners when one-half of the purchase price was to be paid; and to cause the interest of his minor children therein to be also deeded through appropriate court proceedings when the balance of the purchase price was to be paid. It was stipulated that the land should not include any part of the located railroad right of way, but was to run with its outside line; and Spratt was given use of the land free of charge until Campbell or his assigns began mining coal or until the railroad was constructed at that point. Spratt reserved the oil and gas under the land. Pursuant to the agreement Spratt had the land surveyed and the two deeds above mentioned were executed, the first (adults) in 1905, and the other (infants) in 1907. The two deeds contain the same description by metes and bounds, and it begins: ''At a forked beech on the bank of the river at the upper end of said bottom,'' thence down the river by courses and distances by eight calls to a stake, thence leaving the river and crossing the bottom ''S. 83. 55 E. 448 feet to said railroad right of way and up through said bottom binding on the west side of said right of way to the place of beginning.''

The location of this closing line is the matter in controversy. Plaintiffs claim that this last call should be run from the river 448 feet, and from there to the beginning corner at the forked beech in such manner as to limit the boundary to 9-⅛ acres, the quantity called for in the first deed and the quantity called for in the second deed as ''more or less.'' Defendants claim that the line running from the river across the bottom

to the railway right of way should stop when it reaches that right of way (according to engineer Wittenberg at a distance of 433 feet) and follow the right of way to the forked beech, which would make the tract contain 17.94 acres, instead of 9-⅛ acres.

Plaintiffs say that the acreage called for in the Adolph Spratt deed controls the metes and bounds, and that the latter should give way to the former; and should it be held that the boundary includes more than the stated acreage in the Adolph Spratt deed, then they should be decreed a money sum for the excess acreage. On the other hand, defendants say that the trial chancellor properly located the closing line as the west side of the located right of way properly disregarding acreage, and that the evidence and surrounding circumstances show that such was the intention of the original sellers and purchasers; and that plaintiffs' claim for additional compensation is barred by limitation, laches, and lack of equity.

Engineer Stone, who made the survey, calls and distances for Adolph Spratt incorporated in the deeds, has long since departed life. J. D. Lowry who acted for Campbell in making the purchase is also dead, as well as Adolph Spratt, the seller, and we do not have the benefit of their testimony. It is reasonably certain, from the contract of purchase followed by the deeds, that the intention of the parties was to sell and buy the bottom land lying between the located right of way and the river from the forked beech at the river where the right of way leaves the river at the south end of the bottom, and the orchard fence at the north where it ran from the river at right angles with the river and intersected the located right of way. The surveys made by the engineers show without dispute that the 448 feet line from the river to the right of way substantially corresponds with the old rail fence the remains of which are now there. The crucial point in controversy is the proper location on the ground of the railroad right of way. Plaintiffs say that this right of way was indefinite and uncertain, and never was taken over by the railroad by purchase or condemnation; and that three surveys were made, the first in 1903, the second in 1914, and

the third in 1929. The parties contracted with reference to its location on the ground in 1903, when it was staked out, and the map adopted, filed and recorded. Other land owners nearby had actually conveyed rights of way over their lands according to survey shown on the recorded map. The location of that proposed right of way is the important point in this suit. The surveys in 1914 and 1929 have no influence on the deeds made in 1905 and 1907. Good, engineer for plaintiff, from the use of what is called a facsimile map located the right of way nearer to the river than the location made by Wittenberg who used the recorded map filed by the railway company. Good, following the line of the right of way as located by him, says that the acreage contained in the deeds is 16.4 acres. Wittenberg's location of the right of way and his survey on the ground makes the acreage 17.94 acres, a difference of about 1½ acres. Good's survey on the ground ran the closing line arbitrarily, without reference to the railroad right of way, on a curve so as to make the land contain 9-⅛ acres. He made no effort to locate the right of way, but says that it can be accurately located. The testimony shows that if Good's survey prevailed, defendants would receive under the deeds about 3 acres of usable bottom land in two separate pieces, the remainder being subject to overflow from the river. The trial chancellor adopted the location of the right of way as made by Wittenberg, shown to be a capable and experienced engineer, and this finding of fact of the true location on the ground, not being contrary to the preponderance of evidence, will not be disturbed. Plaintiffs were the proponents of the proposition that the closing call could not be located on the ground, meaning that the located right of way could not be located on the ground, and therefore the acreage in the deed would control it location. Their engineer says that the right of way can be accurately located on the ground, but he criticises the location of it made by Wittenberg. The burden was on plaintiffs to show that the closing line could not be located on the ground, before the acreage would control, and the trial chancellor decided that they had not carried that burden. We are not disposed to disturb that finding. ''The general rule in determining

what is included in a conveyance is that general calls for quantity must yield to more certain and locative lines of the adjoining owners which are or can be made certain.'' 9. C. J. 224. ''It is very generally considered that quantity is the least certain element of description and the last to be resorted to in fixing boundaries. Ordinarily all other elements of description must lose their superior value through ambiguities and uncertainties before resort can be had to quantity.'' This quotation is from opinion prepared by Judge Litz in *Gas Co.* v. *Snyder,* 102 W. Va. 75, 78, 135 S. E. 164, 165. It concisely states the law applicable to the issue raised in the bill.

The purpose of the suit (as before stated) is to fix the closing boundary of the land by the quantity conveyed, on the theory that the location of that line was determinable only from the quantity conveyed. Such is the charge in the bill. The evidence was taken on that issue, and when the cause came on for decision June 4, 1931, and the chancellor had pronounced his judgment on that issue, plaintiffs asked to amend the prayer of their original and amended bill so as to include therein a specific prayer for rescision and cancellation of the deeds and restoration of the parties to their former status; and failing that relief, that they be decreed compensation for the quantity of land found to be in excess of the acreage conveyed. This amendment was granted, and by agreement the former demurrers and answers were taken and considered as demurrers and answers to the bills as then amended. There is nothing in the bill on which rescision or cancellation could be based. No mutual mistake is charged. Nor is there any fraud alleged in the transaction; and no offer is made to repay the purchase price paid if the former status be restored.

Can plaintiffs recover in this suit for the excess acreage actually conveyed over the stated acreage? The sale was by the acre at $100 per acre. Why then should not plaintiffs have pay for the excess acreage? It is contended by defendants that Campbell bought the bottom land for the purpose of locating thereon a coal tipple and miners' houses (about which there is no dispute), and that there is by actual

measurement in the tract about 10 acres of bottom land usable for that purpose, the remainder being low rockbars covered with brush and debris subject to overflow from high waters of the river. They argue that it would be inequitable to charge them with the acreage below the banks composed of submergible rockbars. Twenty-five years have passed since the original transaction, and those who conducted it are all dead. The claim for excess acreage is belated and stale. It is reasonable to assume that Adolph Spratt knew what he was doing when he had that survey made and what was contained therein. He knew, or should have known, the location on the ground of the surveyed railway right of way, and that the calls in his deed conforming to his contract (running from the right of way with the orchard fence to the river then with its meanders back to the right of way, at the forked beech agreed upon by all parties as a corner) included more acreage that he conveyed. Whether he considered the rockbars, and land below the break of the bottom land subject to overflow as of no value, is of course chimerical, and in the realm of speculation. If he were living, probably there would be no litigation, and the whole purpose and intent could be satisfactorily established. Campbell, the purchaser, did not know the acreage; he relied on the contract which called for the bottom land lying between the railroad right of way and the river. But the deeds themselves convey 9-1/8 acres and the survey by its calls includes 17.94 acres; and our decisions hold that where there is a sale by the acre and there is more, or less, acreage included in the deed than paid for, the purchaser should pay for the excess on the one hand, and have an abatement of his purchase price on the other. *Sine* v. *Fox*, 33 W. Va. 521, 11 S. E. 218; *Pickens* v. *Pickens*, 72 W. Va. 50, 77 S. E. 365; and *Triplett* v. *Allen*, 26 Grat. 723, 21 Am. Rep. 320. But defendants argue that it would not only be inequitable to allow payment for excess for reason above suggested, but that such claim is barred by limitation and laches. There is merit in the contention that limitation bars recovery for the excess. When the deeds were made, the right of recovery for excess acreage accrued. ''A claim for compensation for deficiency in quantity of land conveyed

by deed, where the purchase money has been paid, is a mere personal demand, not cognizable only in equity, but at law, and is subject to the statute of limitations.'' *Burbridge* v. *Sadler*, 46 W. Va. 39, pt. 4 syl, 32 S. E. 1028, 1029.

The same rule would apply to a claim for excess acreage, where the agreed price had been paid. In *Newberger* v. *Wells*, 51 W. Va. 624, 42 S. E. 625, land had been sold and deeded as containing 2,020 acres upon representations of a surveyor that it contained that acreage. Long afterwards the grantor discovered that there were in the tract 3,800, and charged that the stated amount of acreage in the deed was inserted by mistake occasioned by the representations of the surveyor, in a suit in chancery to recover from the vendee for the excess acreage charging therein that plaintiff had no knowledge of the true acreage until a short time before the institution of the suit. It was held that the statute of limitations applied, the court saying that equity by analogy would apply the statute to stale claims, at the same time recognizing the same exceptions to its operation allowed in courts of law. See also *Coal Co.* v. *Overholt*, 81 W. Va. 427, 94 S. E. 735; *Craig* v. *Gauley Coal Land Co.*, 73 W. Va. 624, 80 S. E. 945; *Thompson* v. *Wittaker Iron Co.*, 41 W. Va. 574, 23 S. E. 795. The bill in the instant case makes no charge of mutual mistake or fraud.

But it is argued that plaintiffs did not know that defendants were claiming a distance of 248 feet from the river out into the bottom to the railway right of way, and thence with the right of way to the beginning corner, until a short time before the bill was filed. The deeds themselves made that claim for defendants. Adolph Spratt and his adult children knew where they had surveyed and deeded in 1905 and the infant children, the youngest of which has long since become of age, had ample time to ascertain the extent of their deeds. Their is no showing of repudiation on the part of defendants of the calls in the deed, or that they did not claim to the extent of the calls therein set out. We do not think the grantee in a deed should be required to proclaim to his vendor that he claims the land covered by his deed in order that the latter may know the extent of his claim. We see nothing in the

record which intimates that defendants did not claim to the railway right of way, or that plaintiffs were misled in that regard. ''Where one has means of knowing or ascertaining his rights where he is put on inquiry, where ordinary prudence should impel him to inquire, he must do so or else time runs against him in the assertion of those rights,'' and ''One who would repel the imputation of laches by showing ignorance of his rights must be. without fault in remaining in ingorance of those rights. Indolent ignorance and indifference will no more avail to prevent the bar of laches than will voluntary ignorance. Equity aids only the vigilant.'' *Plant* v. *Humphreys,* 66 W. Va. 88 (points 6 and 7 syl.) 66 S. E. 94, 26 L. R. A. (N. S.) 558.

It is argued by plaintiffs that the bar of laches is removed because they were in possession of the land. Their possession was the free use of the surface until such time as the railroad was constructed or defendants began mining coal. They had parted with all title to the land, and their possession was permissive and in no way adverse to the title of defendants, and would not stop the running of the statute against their money claim for excess acreage. Moreover, there is a controversy over the possession not decided by the trial chancellor and reserved by him for decision. Laches and limitation are not the same, although of like effect. ''Laches does not, like limitations, grow out of the mere passage of time; but it is founded upon the inequity of permitting the claim to be enforced; an inequity founded on some change in the conditions or relations of the property or parties.'' *Urpman* v. *Lowther Oil Co.,* 53 W. Va. 501, 44 S. E. 433, 97 Am. St. Rep. 1027. Limitation supposes a right in one party to be made good by time, and a right in another to be defeated by time, and is purely statutory. *Foly* v. *County Court,* 54 W. Va. 16, 29, 46 S. E. 246. It is not important in this cause whether the equitable doctrine of laches is, or is not, applicable, if equity, following the law, should apply the statute of limitations. We conclude that the claim of payment for excess acreage is a legal demand due when the deeds were made and the contract price paid in full; that

the statute of limitations then began to run, and that there is no fact shown which tolled the statute during the twenty-five years which have intervened.

The decree will therefore be affirmed.

*Affirmed.*